# UNITED STATES DISTRICT COURT
# FOR THE DISCTRIC OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-524-CKK** |
| **NICOLAS BROCKHOFF** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Nicolas Brockhoff to 51 months' incarceration, three years of supervised release, $2,700 restitution, and a $100 special assessment.   This is the midrange of the 46-57 Sentencing Guidelines range.

## I.    INTRODUCTION

The defendant, Nicholas Brockhoff, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Brockhoff traveled from Kentucky to Washington, D.C. to participate in the events on January 6, 2021.   While at the U.S. Capitol on January 6, 2021, Brockhoff threw an unidentified item at police officers; assaulted multiple police officers in different locations using a fire extinguisher; obtained a police officer's helmet, wearing it throughout his afternoon rioting; entered the U.S. Capitol Building through a broken window that led to a Senate conference room; and once inside the building kicked in a door to gain entrance into a different, locked Senate conference room, which allowed others to enter the room as well; and rifled through belongings in the Senate taking home writing on a Senate notepad.

The government recommends that the Court sentence Brockhoff to 51 months' incarceration, for his conviction of 18 U.S.C. § 111(a)(1) and (b).   This recommendation is within the advisory Guidelines' range of 46-57 months, which the government submits is the correct Guidelines calculation.   A 51-month sentence reflects the gravity of Brockhoff's conduct, but also acknowledges his admission of guilt.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 45 at ¶¶1-7, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

On January 6, 2021, hundreds of rioters, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election. Many rioters attacked and injured law enforcement officers, sometimes with dangerous

weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day.

### Rioting on the West Front

On the West Front of the Capitol grounds, rioters approached the building on January 6, 2021, as depicted in Image 1. The outer perimeter of the Capitol Grounds was made up of bicycle-rack style fencing with AREA CLOSED signs. USCP officers began to gather behind what is labeled in Image 1 as "1st Police Barricade," circled in red and marked as Area A. At 12:52 p.m., the first breach of the outer perimeter occurred at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier. By 12:58 p.m., the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Image 1. They flooded the area labeled "Lower West Plaza," Area C on Image 1, pushing against the barricade there.



**Image 1**

*Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza.   For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of

4

weaponry brought by members of the crowd or seized from the inaugural stage construction site, as depicted in Images 2A-B and 3A-B.



**Image 2A**                                          **Image 2B**

*Screen captures from USCP security footage showing the progression of the crowd from the outer barricades (2A) and beginning to fill the Lower West Plaza (2B).*



**Image 3A**                                          **Image 3B**

*Screen captures from USCP security footage showing the breach of the West Plaza.  The breach of the barricades (3A) was followed by the formation of a USCP officer wall until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (3B).*

Following the conclusion of President Trump's speech at approximately 1:15 p.m., the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol.  At 2:03 p.m., Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd.  It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b).

All people must leave the area immediately.   This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left.   On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

By 2:28 p.m., several large gaps appeared in the police defensive line at the West Front and a general retreat was called.   The rioters had seized control of the West Plaza and the inauguration stage, as depicted in Image 4.   There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent.



**Image 4**
*Screen capture from USCP security footage showing the breakthroughs in the defensive line up onto the inaugural stage.*

***Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the doors of the West Front of the U.S. Capitol Building***

The fighting in the Lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line. *Testimony of USCP Sgt. Gonell, MPD Officer*

*Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace ("LWT"), as described in the Statement of Offense. (ECF No. 45.) That tunnel leads into the basement of the Capitol Building, which allows access throughout the building. The exterior of the tunnel is framed by an archway, which has been the backdrop for nine presidential inaugurations, and is the entrance for the President-Elect and other dignitaries on Inauguration Day, as seen in Image 5.



**Image 5**
*Source: Architect of the Capitol, available at: https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.*

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby. Members of the USCP, assisted by officers from the District of Columbia's MPD, were guarding the entrance; many who had already physically engaged with the mob for

over an hour, having reestablished a defense line here after repositioning from the West Plaza below.

At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and ultimately pushed their way through the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles, and other items. At a later hearing on the events of January 6, Congresswoman Stephanie Murphy described her experience nearby this location in response to testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the tunnel doors between the two forces:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer of power, and it was an attack on this Capitol building, but it was also an attack on real people. And most people don't know this -- and I don't think even you know this -- but your actions had a profound impact on me. So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in. That's about from the distance where I'm sitting here on the dais to that back wall. And from that office in close proximity to where you all held the line, I listened to you struggle. I listened to you yelling out to one another. I listened to you care for one another, directing people back to the makeshift eyewash station that was at the end of our hall. And then, I listened to people coughing, having difficulty breathing, but I watched you and heard you all get back into the fight." Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers. The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against law enforcement, including

the abduction and tasering of MPD Officer Michael Fanone and the previously mentioned assault of Officer Daniel Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force.   Capitol Police Sgt. Aquilino Gonell, who was present in the tunnel that day, explained:

> What we were subjected to that day was like something from a medieval battle. We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process. My fellow officers and I were committed to not letting any rioters breach the Capitol. It was a prolonged and desperate struggle.   *Id.* (Statement of Sgt. Aquilino Gonell)

Despite the mob's efforts, the officers in the LWT held the line with commendable restraint, and through personal sacrifice and valor.   MPD Officer Michael Fanone remembers one of his colleagues' actions that day:

> In the midst of that intense and chaotic scene, [MPD] Commander [Ramey] Kyle remained cool, calm, and collected as he gave commands to his officers. "Hold the line," he shouted over the roar. Of course, that day, the line was the seat of our American government. Despite the confusion and stress of the situation, observing Ramey's leadership, protecting a place I cared so much about, was the most inspirational moment of my life. The bravery he and others showed that day are the best examples of duty, honor, and service.   *Id.* (Statement of Officer Michael Fanone)

Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5 p.m.

9

Despite being under constant assault, these officers nevertheless provided first aid to injured rioters.   It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including potential harm to members of Congress.

### *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and

Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers.   *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways.   *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.8 million dollars.

11

**B.      Brockhoff's Role in the January 6, 2021 Attack on the Capitol**

Brockhoff drove himself over 500 miles from Kentucky to Washington, D.C. to participate in the events on January 6, 2021.   While at the U.S. Capitol on January 6, 2021, Brockhoff threw an unidentified item at police officers; assaulted multiple officers, using a fire extinguisher he appeared to pick up on the inaugural stage seating; obtained a police officer's helmet and wore it throughout the afternoon; entered a Senate room of the U.S. Capitol through a broken window; and once inside the building kicked in a door to gain entrance into a different Senate conference room.

In addition to the images contained in this memo, the government has provided the Court with multiple video exhibits depicting Brockhoff's criminal activity on January 6, 2021, at the United States Capitol.   In many of these videos, Brockhoff can be seen discharging a fire extinguisher from various locations.   Each time he discharges the fire extinguisher, police can be seen turning, coughing, dispersing, etc.   Brockhoff is recognizable in his dark jacket with green-colored hood, hooded sweatshirt underneath the jacket, dark, long pants, backpack, and red gym shoes.

*Lower West Terrace*

Brockhoff made his way up to the stadium seating to the north (left as one is looking at the Capitol) of the inaugural stage and Lower West Terrace tunnel, as depicted in the area marked with a red "X" in Image 6.

12



**Image 6**
*Three-Dimensional Rendering of the United States Capitol*

Brockhoff first appears at approximately 2:31 p.m., in the area depicted with a red "X" in

Image 6, and as seen in Government's Sentencing Exhibit 1 and 5 (MPD officers' body worn

camera ("BWC") videos submitted to the Court), and screen capture depicted in Images 7A-E.



**Image 7A**
*Screen capture from Sentencing Exhibit 1 at timestamp 1:28 (2:31:44 p.m.)*



**Image 7B**
*Screen capture from Sentencing Exhibit 5 at timestamp 00:44 (2:31:56 p.m.)*

Despite commands from police to "back up" (which can be heard in Government's Sentencing Exhibit 5), Brockhoff and other riots proceeded up the stadium seating. From that elevated position, at approximately 2:32 p.m., Brockhoff threw an unidentified item from his position on the West Terrace, the area marked with a red "X" in Image 6, towards police officers, as depicted in Images 7A-C and 8A-B. *See also* Statement of Offense, ECF 45 at ¶9.





**Images 7C, 7D, and 7E**
*Screen captures from Sentencing Exhibit 1 at timestamp 1:50 (2:32 p.m.)*



**Image 8A**                    **Image 8B**

*Open-Source Images*

15

After throwing the unidentified object, Brockhoff continued up the stadium seating where he picked up a fire extinguisher, from the area depicted with a red "X" in Image 6, which appeared to be property of the Capitol or the construction company erecting the inaugural stage. [2] Brockhoff discharged the contents of the fire extinguisher multiple times.  Several times from elevated positions onto the police officers below, as described herein.



**Image 9**
*Screen capture from Sentencing Exhibit 1 at timestamp 2:00 (2:32:16 p.m.)*

Brockhoff first discharged the fire extinguisher from the location he obtained it, as depicted in Image 10, causing a police officer to call out "gas, gas"[3] (which can be heard in Government's Sentencing Exhibit 1 contemporaneous with the first discharge).

---

[2]  Similar fire extinguishers can be seen on the other side of the inaugural stage/stadium seating, in Sentencing Exhibit 5 at timestamp 4:33 and 4:43, time of day 2:35:45 and 2:35:55 p.m.

[3]  MPD MK-46 Oleoresin Capsicum ("OC") cannisters look nearly identical to fire extinguishers.



**Image 10**

*Screen capture from Sentencing Exhibit 1 at timestamp 2:06 (2:32:23 p.m.)*

Just a few seconds later, Brockhoff discharged the fire extinguisher a second time from the stadium seating, as depicted in Image 11



**Image 11**

*Screen capture from Sentencing Exhibit 1 at timestamp 2:17 (2:32:33 p.m.)*

The third time Brockhoff discharged the fire extinguisher it was in the immediate vicinity of the police, as depicted in Image 12, prompting one officer to warn others "watch behind you"

17

and another to warn "watch your back" (which can be heard in Government's Sentencing Exhibit 1 contemporaneous with this discharge).



**Image 12**

*Screen capture from Sentencing Exhibit 1 at timestamp 2:25 (2:32:41 p.m.)*

### *Upper West Terrace*

Brockhoff then relocated to higher ground, as depicted in Image 13.



**Image 13**

*Screen capture from Sentencing Exhibit 1 at timestamp 2:52 (2:33:08 p.m.)*

Brockhoff made his way to the Upper West Terrance above the Lower West Terrace tunnel, as depicted in the area marked with a red "X" in Image 14.



**Image 14**
*Three-Dimensional Rendering of the United States Capitol*

From this elevated position, Brockhoff again discharged the fire extinguisher, for at least the fourth time, for at least eleven seconds, and a direct assault onto the police officers on the Lower West Terrace below, as depicted in Images 15A-B.



**Images 15A-B**
*Screen captures from Sentencing Exhibit 1 at timestamp 3:00 - 3:08*
*(2:33:17 - 2:33:247 p.m.)*

Brockhoff's assault was captured on another MPD BWC, as seen in Government's Sentencing Exhibit 2, a video that has been submitted to the Court, and as depicted in Image 16.



**Images 16**
*Screen captures from Sentencing Exhibit 2 at timestamp 00:16 (2:33:29 p.m.)*

At the time Brockhoff unleashed the contents of the fire extinguisher, police were taking shelter inside the Lower West Terrace tunnel.   The refuge was short-lived, as can be seen in Government's Sentencing Exhibit 3, and screen captures depicted in Images 17A-B.   Police can be seen turning away from the fire extinguisher discharge.



**Images 17A-B**
*Screen captures from Sentencing Exhibit 3 (2:33:25 – 2:33:31 p.m.)*

20

Brockhoff can be seen clearly in Images 18A-B.



**Image 18A**                         **Image 18B**

*Open-Source Images*

A minute later still from an elevated position, Brockhoff again discharged the fire extinguisher, for at least the fifth time, for at least five seconds, and a direct assault onto the police officers on the Lower West Terrace below, as depicted in Images 19A-B.



**Images 19A-B**
*Screen captures from Sentencing Exhibit 1 at timestamp 4:10 – 4:12 (2:34:26 – 2:34:28 p.m.)*

Government's Sentencing Exhibit 4 is a video of Sentencing Exhibits 1, 2, and 3 "side-by-side" showing one of Brockhoff's fire extinguisher attacks from multiple angles, as seen in Image 20.



**Image 20**
*Screen capture from Sentencing Exhibit 4 at timestamp 00:21 (2:33:27 p.m.)*

Government's Sentencing Exhibit 6 is taken from MPD BWC showing another angle of Brockhoff's assault, as depicted in Image 21. Police can be turning away from the fire extinguisher discharge in Exhibit 6.



**Image 21**
*Screen capture from Sentencing Exhibit 6 at timestamp 00:03 (2:33:23 p.m.)*

After Brockhoff's assaults, police can be seen helping one another use water to flush their eyes, as depicted in Images 22A-B.[4]



**Images 22A-B**
*Screen captures from Sentencing Exhibit 5 at timestamp 3:23 – 3:31*
*(2:34:36 -2: 34:43 p.m.)*

### *Upper West Terrace Bleachers*

Brockhoff's next location of assault with the fire extinguisher occurred from the elevated bleacher seating constructed for the inauguration to the south (right as looking at the Capitol), as depicted with a red "X" and the police were below, as depicted with a blue "X" in Image 23.

---

[4] On Sentencing Exhibit 5, Brockhoff can be seen discharging the fire extinguisher from above the police and within approximately 20 seconds the officer in these images can be seen in flushing his eyes.   The fire extinguisher appears to be the source of his impairment. The officer pictured here had his BWC knocked off at 2:02 p.m.



**Image 23[5]**
*Three-Dimensional Rendering of the United States Capitol*

Government's Sentencing Exhibits 7 and 14, MPD BWC, shows Brockhoff's assault with the fire extinguisher from the bleacher seating at 2:42 p.m., which consisted of consecutive discharges and police reaction, as depicted in Images 24A-C and 25A-B.

---

[5] To assist the orientation of the viewer, Government's Sentencing Exhibit 6 (video) shows the officers' path from the Lower West Terrace to the Upper West Terrace behind the bleacher seating where the next assault took place.



**Images 24A**
*Screen capture from Sentencing Exhibit 7 at timestamp 00:08 (2:42:38p.m.)*



**Images 24B-C**
*Screen captures from Sentencing Exhibit 14 at timestamp 7:56 – 7:58*
*( 2:42:29 – 2:42:31p.m.)*



**Images 25A-B**
*Screen captures from Sentencing Exhibit 8 at timestamp 00:12 – 00:18.*

Government's Sentencing Exhibits 9 and 14, MPD BWC, shows the fire extinguisher spray from at least 2:44:03 – 2:44:16 p.m., as depicted, in part, in Images 26A-C.   Officers can be heard on Exhibit 9 discussing the wind is blowing the chemical spray onto them.



**Image 26A**
*Screen capture from Sentencing Exhibit 9 at timestamp 2:13 (2:44:03 p.m.)*



**Image 26B-C**
*Screen captures from Sentencing Exhibit 14 at timestamp 9:25 – 9:34*
*(2:43:57 - 2:44:06 p.m.)*

Each time, Brockhoff discharged the fire extinguishers from elevated positions down onto the police officers below.   These high-ground attacks forced police officers below to disperse, which interfered with their ability to conduct crowd control.   One of the many affected

26

officers was MPD Officer A.H., who was engaged in the performance of his/her official duties by assisting the United States Capitol Police.

### Back on the West Front

Brockhoff next spent time near the mouth of the Lower West Terrace tunnel.   As described above, the tunnel was the site of the most brutal fighting on January 6.   Brockhoff took a MPD helmet from another rioter, as seen in Government's Sentencing Exhibit 10, and as depicted in Image 27.



**Image 27**
*Screen capture from Sentencing Exhibit 10 at timestamp 00:23 (time of day is uncertain)* [6]

The helmet belonged to MPD Officer J.S. Brockhoff wore J.S.'s helmet like a trophy during the afternoon of January 6, 2021, as depicted in Image 28.

---

[6] The exact time this took place is unclear; based on known factors it appears to be sometime after 4:00 p.m.



**Image 28**
*Open-Source Image*

***Inside the U.S. Capitol***

Later in the afternoon, Brockhoff entered the U.S. Capitol Building. Specifically, Brockhoff entered Senate room ST2M through a broken window. Brockhoff's distinct red shoes are visible as he entered the building, as seen in Government's Sentencing Exhibit 11, and depicted in Image 29.



**Image 29**
*Open-Source Image*

Once inside the U.S. Capitol Building, Brockhoff and others left ST2M, went into the hallway, and forcibly entered another room ST6M (a Republican Conference Room).

Specifically, Brockhoff participated in kicking the door of ST6M and pointed and directed another rioter to kick "farther to the right." Once there was an opening on the lower portion of the door, Brockhoff then reached his hand through that opening to open the door to ST6M from the inside, as seen in Government's Sentencing Exhibit 12, and depicted in Images 30A-D.



Screen captures from Sentencing Exhibit 12, which is an open-source video available at https://www.youtube.com/watch?v=C4sIl5URW5Q.

Brockhoff breaking into ST6M not only gave him access to the room but allowed other rioters to access it as well.   As seen in Government's Sentencing Exhibit 12, Brockhoff can be seen inside one of the conference rooms in the U.S. Capitol Building, wearing the MPD helmet, tearing open a box, rifling through the office, and taking a piece of paper (recovered during the

search of his home), as depicted in Images 31 and 32.   The piece of paper Brockhoff took appears

to have been a personal, handwritten note on Senate stationary, featuring a Bible verse.



**Image 31**
*Screen capture from Sentencing Exhibit 12.*



**Image 32**
*Note recovered during the search of Brockhoff's home.*

Once police officers were able to clear rioters from inside the Capitol building after 5:00

p.m., Brockhoff was confronted, as seen in Government's Sentencing Exhibit 13, regarding his

wearing an MPD's officer helmet, and relinquished the helmet only at that point, as depicted in

Image 33.  Brockhoff claimed he found the helmet, when he actually accepted it when another

rioter passed it around the mob.



**Image 33**
*Screen capture from Sentencing Exhibit 13 at timestamp 00:02 (5:07:22 p.m.)*

On May 27, 2021, officers executed a search warrant on Brockhoff's home.   During that search, officers recovered the red shoes Brockhoff wore on January 6, 2021, as well as the writing on a Senate notepad mentioned above.

### *Injuries*

Although Officer A.H., the assault victim in this case, reported that he did not suffer any physical injuries from the fire extinguisher spray, the defendant's participation in this riot aided those rioters who did succeed in injuring officers and destroying property. *See* Section II(A) ("Injuries and Property Damage Caused by the January 6, 2021 Attach") *supra.* His violent conduct served to incite and embolden other violent rioters around him.   MPD Commander Ramey Kyle describes the circumstances throughout the afternoon of January 6 and injuries suffered, as seen in Government's Sentencing Exhibit 15.

### III.    THE CHARGES AND PLEA AGREEMENT

On January 26, 2022, a federal grand jury returned a superseding indictment charging Brockhoff with eight counts, including, Count One, Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111 (a)(l) and (b); Count Two, Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b); Count Three, Civil Disorder, in violation of 18 U.S.C. § 231 (a)(3); Count Four, Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); Count Five, Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Count Six, Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); Count Seven, Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F); Count Eight, Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G)). On, October 27, 2022, Brockhoff was convicted of Count Two, 18 U.S.C. § 111(a)(1) and (b), based on a guilty plea entered pursuant to a plea agreement.

### IV.    STATUTORY PENALTIES

Brockhoff now faces sentencing on Count Two, Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.     Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Brockhoff's felonious conduct on January 6, 2021 was part of a massive riot that delayed and almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. While within the restricted perimeter at the U.S. Capitol on January 6, 2021, for approximately three hours, Brockhoff threw an unidentified item at police officers; assaulted numerous officers using a fire extinguisher on multiple occasions; obtained a police officer's helmet, wearing it throughout the afternoon; entered a Senate conference room in the U.S. Capitol Building through a broken window; and once inside the building kicked in a door to gain entrance into a sensitive space (a different, locked Senate conference room), in which Brockhoff rifled through a box and papers and ultimately took a paper home with him.   The nature and circumstances of Brockhoff's offense were of the utmost seriousness, and fully support the government's recommended sentence of 51 months' incarceration, three years' supervised release, and restitution in the amount of $2,700.

33

**B.  The History and Characteristics of the Defendant**

Brockhoff's conduct on January 6, 2021 demonstrates a violent character and disrespect for law enforcement, government property, and our civic institutions and traditions, despite his age and lack of prior criminal convictions.

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Brockhoff's criminal conduct, throwing an object at police, using a fire extinguisher to assault police multiple times from at least two locations, take an MPD helmet, crawl into the Capitol Building through an open window, rifle through personal objects, and encourage additional damage and entry into another room, was the epitome of disrespect for the law.

**D.     The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

---

[7] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

Although Brockhoff had no criminal history prior to January 6, 2021, his conduct on January 6 consisted of a *series* of criminal acts over approximately three hours, ranging from throwing an item at police, to committing multiple assaults in different locations against police officers (as officers attempted to defend the Capitol Building from mobs of other rioters), to breaking into multiple rooms in the Capitol Building, including forcibly breaking into a sensitive area where Brockhoff then rifled through Senate belongings, to taking a police item (helmet) and wearing it while continuing to riot.   There was not a single act that, even under normal circumstances, someone would think is legally permissible, let alone during a violent riot at one of three main seats of Government in the United States.   Accordingly, Brockhoff requires a sentence sufficient to provide specific deterrence from committing future crimes of violence, particularly in light of his violent assaults on January 6.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of

the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[8]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[9]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.

---

[8] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Palmer*, 21-cr-328-TSC, similar to Brockhoff, defendant Palmer threw items at officers (including a plank, fire extinguisher, and pole) and discharged the contents of a fire extinguisher directly onto police officers on the West Front (specifically, those officers in the Lower West Terrace tunnel).   For assaulting law enforcement officers with a dangerous or deadly weapon, Palmer was sentenced to 63 months' imprisonment for violating 18 U.S.C. § 111(a) and (b).[10]

*In United States v. Caldwell*, 21-cr-181-CKK,   this Court sentenced Caldwell to 70 months' incarceration for using chemical spray on police, in violation of 18 U.S.C. § 111(a)(1) and (b). This was a mid-range sentence, as the Guideline range was 63-78 months in Caldwell's case, due to the victim's bodily injury.

In *United States v. Miller*, 21-cr-75-RDM, similar to the instant case, defendant Miller threw items (a can of beer and batteries) at officers at the West Front (specifically, those officers at the Lower West Terrace tunnel) and discharged the contents of a fire extinguisher on officers. However, distinct from the instant case, Miller did *not* enter the Capitol Building at all, let alone

---

[10]  Palmer did not receive a three-level reduction pursuant to U.S.S.G. §3E1.1, because of his post-plea conduct.   Had he received that reduction, Palmer's guideline range would have been the 46-57 months' incarceration range as here.   Instead, Palmer's Guidelines range without the acceptance of responsibility adjustment was 63-78 months' incarceration. Palmer's conviction pursuant to 18 U.S.C. § 111(b) was for throwing the fire extinguisher (and other objects) at police, not for discharging the contents of the fire extinguisher.

forcibly break into sensitive areas.   Miller was sentenced to 33 months' imprisonment for

violating 18 U.S.C. §§ 1512(c)(2) and 111(a).

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579,

96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary

authority to order restitution to victims of most federal crimes."[11] *United States v. Papagno*, 639

F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to

impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement."

*See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim in this case, Officer

A.H., did not suffer bodily injury as a result of Brockhoff's assault. The parties agreed, as permitted

under 18 U.S.C. § 3663(a)(3), that Brockhoff must pay $2,700 in restitution to the Architect of the

Capitol, which reflects in part the role Brockhoff played in the riot on January 6.[12] Plea Agreement

---

[11] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[12] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,734,783.14" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* Brockhoff's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 98.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 51 months' incarceration, three-years of supervised release, $2,700 restitution, $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:     */s/ Jacqueline Schesnol*
JACQUELINE SCHESNOL
Assistant United States Attorney
AZ Bar No. 016742
40 N. Central Ave., Suite 1800
Phoenix, AZ 85004-4449
(602) 514-7500
jacqueline.schesnol@usdoj.gov