## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**
       **Plaintiff,**
**v.**                             **CASE NUMBER: 21-CR-524**
**NICHOLAS JAMES BROCKHOFF,**
       **Defendant.**
_____/

### SENTENCING MEMORADUM ON NICHOLAS BROCKHOFF

COMES NOW, the Defendant, NICHOLAS BROCKHOFF, by and through the undersigned counsel, pursuant to the Federal Rules of Criminal Procedure and Federal Statues, and files this Sentencing Memorandum requesting a sentence of time served and supervised release setting forth all factors that the Court should consider in determining what type and length of sentence is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. 3553 (a). Nicholas Brockhoff believes that the United States Sentencing Guidelines should not be used to determine his sentence in this case, and respectfully requests that this Court impose a sentence that is Fair, and substantially below any sentence suggested by the guidelines.

The Defense is in receipt of the Presentence Report in this cause. Nicholas Brockhoff does not object to the Guideline Analysis and has not submitted written objections. The PSR contemplates a sentence of 46-57 months prison, which we feel is unjust but shows the flaws of the Guideline system. Nicholas Brockhoff offers his arguments below and submits that any Guideline sentence in this case would be unjust and would vastly overstate the seriousness of the offense.

Nicholas Brockhoff states as follows:

### BACKGROUND

On June 14, 2021, a federal grand jury for the District of Columbia returned a seven-count Indictment charging NICHOLAS BROCKHOFF with Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon (18 USC 111(a)(1) and (b)), Civil Disorder (18 USC

231(a)(3), Entering and Remaining in a Restricted Building or Grounds (18 USC 1752(a)(1),

Disorderly and Disruptive Conduct in a Restricted Building or Grounds (18 USC 1752(a)(2),

Disorderly Conduct in a Capitol Building (40 USC 5104(e)(2)(D), Act of Physical Violence in the

Capitol Grounds or Buildings (40 USC 5104(e)(2)(F), and Parading, Demonstrating, or Picketing in

a Capitol Building (40 USC (e)(2)(G).

Mr. Brockhoff was arrested on May 27, 2021.  Since the date of his arrest, Mr. Brockhoff

has been incarcerated in the Northern Neck Regional Jail, and then due to deplorable conditions,

USP Lewisburg, in Lewisburg, Pennsylvania.  These deplorable conditions included exposure to

molds, constant lockdowns, and one hour per week – if weather "allowed" – outside.  Exposure to

dirty environments and pests – including rats and roaches – were constant in the food.

On October 27, 2022, Mr. Brockhoff pled guilty to one count of Assaulting, Resisting, or

Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 USC 11(a)(1) and (b),

pursuant to a written plea agreement and Rule 11(c)(1)(B).  In accord with the plea agreement, the

parties concurred the base offense level was 14, increased as follows to a level 26 due to guideline

enhancements for a dangerous weapon (+4), being convicted under 111(b), (+2), and for their being

an official victim (+6).  The Government will recommend a three-level reduction for acceptance of

responsibility, pursuant to USSG 3E1.1, thereby resulting in a total offense level of 23, and 46-57

months.

As noted in the PSR, Nicholas Brockhoff has no prior record (PSR DKT#54).  This case

represents the first time Nick has ever been in a courtroom.  This case is the story of a young man

whos future will be dictated by less then one hours time in Washington, D.C.  Nick is law-abiding,

hard-working, caring, generous, and the kind of young man you would not hesitate to hire or

introduce to family.  In a matter of a few hours, Nick lost his bearings and his way, and – for less

than 10 minutes – found himself in a place he shouldn't have been with actions he knows he

shouldn't have taken.

At all times throughout, Nick cooperated with law enforcement, to include making himself available to law enforcement – despite traveling – so they could effectuate his arrest.  Nick further cooperated with the prosecution in this cause by entering his plea.  Mr. Brockhoff understands what he has done, is apologetic for his actions and offers no excuses for his conduct.  Given the events which took place on January 6, 2021, and the notoriety of the same, I am privileged and honored to write this memorandum on his behalf, and hope the memorandum provides some insight to this Honorable Court into this young man that stands before her.

### DEFENDANT, NICHOLAS BROCKHOFF'S ARGUMENTS FOR VARIANCES PURSUANT TO 18 USC 3553(a)

We are a Nation divided unlike no other time in United States history.  The nation is gridlocked over social issues, race, gender, and the economy.  Borders became battlefields, the world against white men, rural versus urban, sex, faith, and ethnicity all became issues of polarization.  America is divided in so many ways, and these differences boiled over in the 2020 presidential election and its certification of the same on January 6, 2021.

### SENTENCING FACTORS

As a result of the United States Supreme Court's decision in *United States v. Booker,* 543 U.S. 220 (2005), sentencing Courts are no longer constrained solely by the federal sentencing guidelines and must now consider each of the factors enumerated in 18 U.S.C. 3553(a) to fashion an appropriate sentence.  An appropriate sentence is one that is "sufficient but not greater than necessary" to comply with the purposes set forth in 18 U.S.C. 3553(a)(2). *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).  The advisory sentencing guideline range is but one of the many relevant factors in the sentencing court's determination of an appropriate sentence. 18 U.S.C. 3553(a).

**Sentencing under *Booker***

In United States v. Booker, 125 S. Ct. 738, 756 (2005), the Supreme Court, reaffirming its holding Apprendi v. New Jersey, 530 U.S. 466 (2000), concluded that the provisions of the Federal

Sentencing Reform Act of 1984 were not to be applied as though they were mandatory, essentially making the guidelines advisory. Id. at 757.   Therefore, instead of being bound by the Sentencing Guidelines, the Sentencing Reform Act, as being revised by Booker:

> [R]equires a sentencing court to consider Guidelines ranges, see U.S.C.A.
> 3553(a)(4)(Supp. 2004), but it permits the court to tailor the sentence in light of other
> statutory concerns, as well. See 3553(a).

> Booker, 125 S. Ct. at 757.

Therefore, under Booker, sentencing Courts must treat the sentencing guidelines as just one of a number of sentencing factors that are otherwise set forth in 18 U.S.C. 3553(a).   The primary directive in Section 3553(a) is for sentencing courts to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2 of the section.   Section 3553(a)(2) states that such purposes are:

(A)     To reflect the seriousness of the offense, to promote respect for the law, and
        to provide just punishment for the offense;
(B)     To afford adequate deterrence to criminal conduct;
(C)     To protect the public from further crimes of the defendant; and
(D)     To provide the defendant with needed educational or vocational training,
        medical care, or other correctional treatment in the most effective manner.

In determining the minimally sufficient sentence, 3553(a) further directs sentencing courts to consider the following factors, inter alia:

1)      The nature and circumstances of the offense and the history and characteristics of the
        defendant; (3553(a)(1));
2)      The kinds of sentences available; (3553(a)(3));
3)      The need to avoid unwarranted sentence disparities among defendants with similar
        records who have been found guilty of similar conduct (3553(a)(6)); and
4)      The need to provide restitution to any victims of the offense ( 3553(a)(7)).

Additionally, other statutory sections also give the district court guidance in sentencing.   For example, 18 U.S.C. 3582 provides that the imposition of a term of imprisonment is subject to the following limitation: "in determining whether and to what extent imprisonment is appropriate based on the Section 3553(a) factors, the judge is required to recognize that imprisonment is *not* an appropriate means of promoting correction and rehabilitation." (Emphasis added).

In accordance with 18 U.S.C. 3661, *no limitation* shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence (emphasis added).  This includes as relevant to sentencing a variety of factors such as the defendant's age, educational and vocational skills, mental and emotional conditions, drug or alcohol dependence, and lack of guidance as a youth.  *See* U.S.S.G. 5H1.  See also United States v. Nellum, 2005 WL 300073, 2005 U.S. Dist. LEXIS 1568 (N.D. Ind. Feb. 3, 2005) (Simon, J.) (taking into account fact that defendant, who was 57 at sentencing, would upon his release from prison have a very low likelihood of recidivism since recidivism reduces with age; citing Report of the U.S. Sentencing Commission, Measuring Recidivism: the Criminal History Computation of the Federal Sentencing Guidelines, May 2004); United States v. Naylor, __ F. Supp. 2d __, 2005 WL 525409, *2, 2005 U.S. Dist. LEXIS 3418 (W.D. Va. Mar. 7, 2005) (Jones, J.) (concluding that sentence below career offender guideline range was reasonable in part because of defendants youth when he committed his predicate offenses he was 17 and noting that in Roper v. Simmons, 125 S. Ct. 1183, 1194-96 (2005), the Supreme Court found significant differences in moral responsibility for crime between adults and juveniles).

The directives of Booker and 3553(a) make clear that courts may no longer uncritically apply the guidelines.  Such an approach would be inconsistent with the holdings of the merits majority in Booker, rejecting mandatory guideline sentences based on judicial fact-finding, and the remedial majority in Booker, directing courts to consider all of the 3353(a) factors, many of which the guidelines either reject or ignore.  United States v. Ranum, 353 F. Supp. 2d 984, 985-86 (E.D. Wisc. Jan. 19, 2005) (Adelman, J.).  As another district court judge has correctly observed, any approach which automatically gives heavyweight to the guideline range comes perilously close to the mandatory regime found to be constitutionally infirm in Booker. United States v. Jaber, __ F.

Supp. 2d __, 2005 WL 605787 *4 (D. Mass. March 16, 2005) (Gertner, J.). See also United States v. Ameline, 400 F.3d 646, 655-56 (9th Cir. Feb. 9, 2005) (advisory guideline range is only one of many factors that a sentencing judge must consider in determining an appropriate individualized sentence), hrg en banc granted, 401 F.3d 1007 (9th Cir. 2005). Justice Scalia explains the point well in his dissent from Bookers remedial holding:

> Thus, logic compels the conclusion that the sentencing judge, after considering the recited factors (including the guidelines), has full discretion, as full as what he possessed before the Act was passed, to sentence anywhere within the statutory range. If the majority thought otherwise if it thought the Guidelines not only had to be considered (as the amputated statute requires) but had generally to be followed its opinion would surely say so.

> Booker, 125 S. Ct. at 791 (Scalia, J., dissenting in part).

Likewise, if the remedial majority thought the guidelines had to be given heavy weight, its opinion would have said so. The remedial majority clearly understood that giving any special weight to the guideline range relative to the other Section 3553(a) factors would violate the Sixth Amendment.

In sum, in every case, a sentencing court must now consider all of the 3553(a) factors, not just the guidelines, in determining a sentence that is sufficient but not greater than necessary to meet the goals of sentencing. And where the guidelines conflict with other sentencing factors set forth in 3553(a), these statutory sentencing factors should generally trump the guidelines. See United States v. Denardi, 892 F.2d 269, 276-77 (3d Cir. 1989) (Becker, J, concurring in part, dissenting in part) (arguing that since 3553(a) requires sentence be no greater than necessary to meet four purposes of sentencing, imposition of sentence greater than necessary to meet those purposes violates statute and is reversible, even if within guideline range).

**Discussion of the Guidelines in Hunt**

Beyond what may be permissible under the Guidelines, "the history and

characteristics of the defendant," 18 U.S.C. § 3553(a), and the other factors set forth in 18

U.S.C. § 3553(a)(2) support a sentence of probation with a period of home detention. In

United States v. Hunt, 459 F.3d 1180, 1182 (11th Cir. 2006), the court summarized the

factors that must be considered:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
>> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B)   to afford adequate deterrence to criminal conduct;
>> (C)   to protect the public from further crimes of the defendant; and
>> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range established . . .;
> (5) any pertinent [Sentencing Commission] policy statement . . .;
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

As recognized in Hunt, there has been a continuing debate among the courts as to how

much weight should be given to one of the listed factors, the Sentencing Guidelines. 459

F.3d at 1183- 1184. The decision in Hunt, however, has resolved the debate for the

Eleventh Circuit. In the decision, the court rejected "any across-the-board prescription

regarding the appropriate deference to give the guidelines." 459 F.3d at 1184. Rather, a

"District court may determine, on a case-by-case basis, the weight to give the Guidelines,

so long as that determination is made with reference to the remaining section 3553(a)

factors that the court must also consider in calculating the defendant's sentence." 459

F.3d at 1185. Thus, as recognized by Judge Tjoflat in United States v. Glover, 431

F.3d 744, 752-753 (11th Cir. 2005), in some cases the Guidelines may have little

persuasive force in light of some of the other § 3553(a) factors:

Although "judges must still consider the sentencing range contained in the Guidelines, . . . that range is now nothing more than a suggestion that may or may not be persuasive . . . when weighed against the numerous other considerations listed in [§ 3553(a) ]." Id. at 787 (Stevens, J., dissenting). Indeed, as one district judge has already observed,

the remedial majority in Booker [] direct[s] courts to consider all of the § 3553(a) factors, many of which the guidelines either reject or ignore. For example, under § 3553(a)(1) a sentencing court must consider the "history and characteristics of the defendant." But under the guidelines, courts are generally forbidden to consider the defendant's age, his education and vocational skills, his mental and emotional condition, his physical condition including drug or alcohol dependence, his employment record, his family ties and responsibilities, his socio-economic status, his civic and military contributions, and his lack of guidance as a youth. The guidelines' prohibition of considering these factors cannot be squared with the § 3553(a)(1) requirement that the court evaluate the "history and characteristics" of the defendant, United States v. Ranum, 353 F. Supp. 2d 984, 986 (E.D.Wis.2005) (citations omitted). Thus, mitigating circumstances and substantive policy arguments that were formerly irrelevant in all but the most unusual cases are now potentially relevant in every case.

## Discussion of the Guidelines in Gall

The Sentencing Guidelines were again discussed by the Court in Gall v. United

States, 128 S Ct. 586 (2007).  In Gall, the Court set forth a number of important

Principles.  First, the Court made clear that the sentencing guidelines are advisory and

that appellate review is limited to the issue of "reasonableness."

As a result of our decision [in Booker], the Guidelines are now
advisory, and appellate review of sentencing decisions is limited
to determining whether they are "reasonable."  Our explanation of
"reasonableness" review in the Booker opinion made it pellucidity
Clear that the familiar abuse of discretion standard of review now applies
To appellate review of sentencing decisions. Id.

Second, it is equally clear that the sentencing judge must explain his or her

reasons for departing from the guidelines:

It is also clear that a district court judge must give serious consideration
To the extent of any departure from the Guidelines and must explain his
Conclusion that an unusually lenient or unusually harsh sentence is
Appropriate in a particular case without sufficient justification. Id.

Third, the opinion placed certain restrictions to the extent of appellate review of a sentence

outside the advisory guideline range, and specifically disapproved of certain criteria that had been

utilized in <u>Booker</u>:

> In reviewing the reasonableness of a sentence outside the guidelines
> range, appellate courts may therefore take the degree of variance into
> account and consider the extent of a deviation from the Guidelines.  We reject,
> however, an appellate rule that requires "extraordinary" circumstances to justify
> a sentence outside of the Guidelines range.  We also reject the use of a rigid
> mathematical formula that uses the percentage of a departure as the standard
> for determining the strength of the justification required for a specific sentence.

Fourth, while the Court had permitted the circuit courts to adopt a presumption of

reasonableness for sentences within the guidelines range, it did not follow that these courts could

adopt a presumption of unreasonableness for sentences outside the range:

> As an initial matter, the approaches we reject come too close to creating
> an impermissible presumption of unreasonableness for sentences outside
> the Guidelines range….Even the Government has acknowledged that such
> a presumption would not be consistent with <u>Booker</u>.

Finally, the Court gave its reasons for its rejection of the "mathematical approach:"

> The mathematical approach also suffers from infirmities of application.
> On one side of the equation, deviations from the Guidelines range will
> always appear more extreme – in percentage terms – when the range is low,
> and a sentence of probation will always be a 100% departure regardless
> of whether the Guidelines range is 1 month or 100 years.  Moreover,
> qualifying the variance as a certain percentage of a maximum, minimum,
> or median prison sentence recommended by the Guidelines gives no
> weight to the 'substantial restriction of freedom" involved in a term of
> supervised release or probation.

> More importantly, both the exceptional circumstances requirement and the
> rigid mathematical formulation reflects a practice – common among courts
> that have adopted "proportional review" – of applying a heightened standard
> of review to sentences outside the Guidelines range.  This is inconsistent
> with the rule that the abuse of discretion standard of review applies to
> appellate review of all sentencing decisions – whether inside or outside
> the Guidelines range.

With its decision in <u>Gall</u>, the Supreme Court laid to rest any argument whatsoever that trial judges

are required to impose sentences within the sentencing guidelines range.  Sentencing Guidelines are

merely advisory.  Courts are to impose reasonable sentences consistent with the principles set forth

in the sentencing guidelines.  And appellate Courts are to review sentences using a reasonableness standard.

### Application of the Statutory Sentencing Factors to the Facts of this Case

The law is clear that this Court, in making its "individualized assessment" of the defendant, must consider all the facts and circumstances in fashioning a sentence which Meets 3552(a)'s express mandate of imposing a sentence that is "sufficient, but not greater" than necessary to meet the purposes imposed by law.  These facts and circumstances include Brockhoff's young and tender age, lack of priors, his lack of formal education, his good (albeit short) life and exemplary conduct, the length of incarceration pretrial, the fact Brockhoff was never disciplined while in custody, and the fact Brockhoff sought higher level education (college correspondence) on his own initiative, and the fact Brockhoff would pay restitution, we submit that these numerous 3553 factors militate heavily in favor of a non-guidelines sentence.  The sentencing guidelines "do not require a judge to leave compassion and common sense at the door to the courtroom. United States v. Milikowsky, 65 F.3d 4, 9 (2d Cir. 1995).

If the Court finds the applicable guideline range of 46-57 months correct, we believe it overstates his culpability.  Therefore, as explained above, when considering the factors as set forth in 3553(a), without question, a non-guidelines sentence is the appropriate sentence for Nicholas Brockhoff.

 In the present case, the following factors must be considered when determining what type and length of sentence is sufficient, but not greater than necessary, to satisfy the purposes of sentencing:

## 1.    The Nature and Circumstances of the Offense and the History and Characteristics of the Offender

### (a)    The Nature and Characteristics of the Offense

Nick arrived at the Capitol to witness what Nick and many thought would be history.

President Trump was going to address the nation from the Ellipse, expressing to his supporters that they were "patriots" for being committed to honesty and integrity in the election process.  Former President Trump than outlined how the election – in his mind – was stolen. Trump proceeded to discuss how they all gathered in Washington, D.C. to "save our democracy."  Trump stated:

> Now, it is up to Congress to confront this egregious assault on our democracy. And after this, we're going to walk down, and I'll be there with you, we're going to walk down, we're going to walk down.
>
> Anyone you want, but I think right here, we're going to walk down to the Capitol, and we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them.
>
> Because you'll never take back our country with weakness. You have to show strength and you have to be strong. We have come to demand that Congress do the right thing and only count the electors who have been lawfully slated, lawfully slated.
>
> I know that everyone here will soon be marching over to the Capitol building to peacefully and patriotically make your voices heard.

Unfortunately, for a small few, the Capitol was anything but peaceful, and twenty (20) year old Nicholas Brockhoff got drawn in.  Nick was not part of a group or part of any collective who may have had an ill motive or bad intentions.  At some point in his brief time at the Capitol, Nick became caught up in some of the negative behavior which occurred on January 6, 2023.  Prior to Nick's entry in the Capitol, Nick was handed a fire extinguisher.  From a higher tier balcony, Nick – in strong winds – discharged the non-toxic contents of a fire extinguisher to a lower tier.  The contents of the fire extinguisher made contact with several law enforcement officers who were at least thirty (30) to forty (40) feet away, did not cause injury or damage to any person or law enforcement officer, and interfered in those law enforcement's duties for what may have amounted to less than ten seconds.

Nick located a law enforcement helmet near the Lower West Terrace Tunnel.  Nick entered the Capitol through a broken window (that was already broken and NOT broken by Nick), and entered a room, left that room, and entered another room by breaking and/or aiding in breaking the

door.  Nick rifled through some documents after opening a drawer to a desk in that second room.

Nick took nothing, and on the way out, responded to a law enforcement request to return the helmet.

The Assault/Battery to which Nick pled was at best de minimis and by its nature not the

violent type of conduct one associates with assaults and/or battery of law enforcement.  The

contents of a fire extinguisher are non-toxic, did not cause injury, did not damage any equipment,

and the contents of the same caused de minimis interference in law enforcement's duties.  Again,

lacking injury or damage and having de minimis interference is not the type of statements one

would expect when speaking of what is normally a dangerous violent crime upon law enforcement.

**(b) History and Characteristics of Nicholas Brockhoff**

Nick was twenty at the time of the commission of the offense.  Nick was a recent

high school graduate.  Nick had never experienced contact with law enforcement, nor a

courtroom and certainly never a United States Criminal District Court.  Nick was

employed, and was taking some time off to travel and visit multiple parts of the United

States.  Prior to January 6, 2021, Nick was a recent high school graduate where he was one of the

best students to matriculate through Holmes High School. While there, he was a letterman in

several sports.  Nick always challenged himself in school taking Advanced Placement (AP) courses

as well as International Baccalaureate courses. Nick also always maintained full time employment

with Lemus Home Building and Remodeling, LLC.  When Dave Remus needed help, he could

rely on Nick who became Mr. Lemus apprentice.  Nick's efforts continued while at the Northern

Neck Regional Jail.  It should be noted, Nick maintained employment at the Northern Neck

Regional Jail in the culinary area, and Nick established college courses (by mail) while in pretrial

detention. Nick's age should be considered by this Court as relevant and utilized in

determining whether a departure is warranted. See attached Exhibit "A, Letters in support."

> *(1) Nicholas Brockhoff does not fit the profile of the average Federal Defendant who is incarcerated.*

As of March 23, 2023, there were 159,070 inmates in the Bureau of Prisons. The average federal inmate is 41 years of age.  21.6 percent of all federal inmates are 50 years of age or older. The majority of those defendants are serving incarceration sentences for drug trafficking and firearms offenses.  The average guideline minimum for offenders in federal prison were 166 months, with an average length of imprisonment of 147 months.  See Quick Facts – Federal Offenders in Prison – January 2022.  As of April 23, 2023, 1,538 inmates were incarcerated in the Bureau of Prisons ages 18-21.  This amounts to less than one percent of all detained federal inmates.  Federal Bureau of Prisons – Inmate Age data – April 22, 2023.  Nick is not your average defendant, is not charged with drug trafficking nor firearms offenses, and a departure based on age is warranted.

There are a number of decisions where courts have given notably less weight to the Sentencing Guidelines in recognition of the fact that older individuals, some as young as 40, are less likely to commit additional crimes. See United States v. Carmona-Rodriguez, No. 04CR667RWS, 2005 WL 840464 (S.D.N.Y. April 11, 2005); United States v. Hernandez, No. 03 CR 1257(RWS), 2005 WL 1242344 (S.D.N.Y. May 24, 2005); United States v. Nellum, No. 2:04-CR-30-PS, 2005 WL 300073 (N.D. Ind. February 3, 2005); and United States v. Phillips, 368 F. Supp. 2d 1259 (Dist. N.M. March 21, 2005). In United State v. Testerman, No. 1:06CR00004, 2006 WL 2513018 (W.D.Va. Aug. 31, 2006), the 79-year-old defendant received three years of probation with four months of home detention rather than the twenty-seven to thirty-three months the Guidelines recommended for his charge of dealing in firearms. *1. The court found that the sentence would "adequately deter" the defendant and others, in part, because of the

defendant's "advanced age [and] his previous law-abiding life." *3.

(2) *The Young Adult Brain and its development is a factor Courts have taken into account when analyzing legal culpability*

This August 2015 article from the American Bar Association, <u>Understanding the Adolescent Brain and Legal Culpability</u>, by Morgan Tyler offers insight into why Nick in the instant case would have made seemingly the irrational choices he made, and how the maturing adolescent / young adult brain has been a factor taken into account by the Courts and by the United States Supreme Court when analyzing legal culpability during sentencing:

August 01, 2015

Understanding the Adolescent Brain and Legal Culpability

Morgan Tyler

The views expressed herein have not been approved by the House of Delegates or the Board of Governors of the American Bar Association, and accordingly, should not be construed as representing the policy of the American Bar Association.

Only 11 years old, Xavier McElrath-Bey joined a gang on the south side of Chicago. At age 13, Xavier was sentenced to 15 years in prison for a gang murder. He was released from jail at age 28 with a college degree and a desire to make a difference in the world. Xavier now advocates for youth rights and fair sentencing of juveniles for the Campaign for Fair Sentencing of Youth. Xavier has dedicated his life to preventing juveniles from traveling a similar path.

Xavier joined an expert panel at the ABA webinar, "Rethinking Juvenile Justice: Adolescent Brain Science and Legal Culpability," on June 10, 2015. Experts highlighted how juveniles' brains differ from adults' and how those differences should be weighed when deciding their legal culpability for committing crimes.

Experts included:

- Jennifer Woolard, associate professor of psychology at Georgetown University and co-director of the graduate program's Human Development and Public Policy track;

- Robert Kinscherff, senior administrator and director of the concentration in Forensic Psychology in the doctoral clinical psychology program at William James College; and

- Marsha Levick, co-founder, deputy director and chief counsel of the Juvenile Law Center, America's oldest public interest law firm for children.

How the Juvenile Brain Functions

While juveniles can be legally tried as adults, their brains are extremely different, said Kinscherff. One of the key differences between adult and adolescent brains, highlighted by Kinscherff, is the lack of prefrontal cortex development in young brains. The prefrontal cortex controls humans' ability to:

- delay and reflect (the lack of development limits the amount of time juveniles will think before they act);

- take all options into account (juveniles are extremely impulsive);

- contemplate risks and consequences (sensation seeking is at an all-time high at mid-adolescence);

- have social intelligence (juveniles have difficulty being empathetic and are susceptible to peer pressure).

Two other brain systems that are key for understanding the adolescent brain include the social-emotional system and the cognitive control system.

The **social-emotional system** includes the limbic midbrain system and the orbital frontal areas of the frontal lobe. It develops faster than the cognitive control system. The social-emotional system controls the emotional state of the brain. With the rapid development of this system teens have:

- increased need for a sense of rewards,
- increased sensation seeking,
- more reactive emotional responses to both positive and negative emotions,
- increased attentiveness to social cues.

The **cognitive control system** includes the dorsolateral area of the frontal lobe. This system provides a check to the social-emotional system but takes longer to develop. As the cognitive control system matures through adolescence it provides:

- increased impulse control,
- better emotional regulation,
- more foresight and detection of options,
- better planning and anticipation of outcomes,
- greater resistance to stress and peer pressure.

With differences in development, the brain is essentially being given the "gas" of the social-emotional system without having mature "brakes" of the cognitive control system. This leads to these trends in the juvenile brain:

- Impulsivity declines with age.

- Sensation seeking declines with age.

- Susceptibility to peer influence declines with age.

15

- Time spent problem solving increases with age.

- Gratification delays increase with age.

**Applying Neuroscience to Juvenile Culpability**

Woolard highlighted how adolescent defendants may have less criminal culpability than their adult counterparts based on the latest neuroscience. The legal process is confusing no matter the age of the defendant. When polled, the percentage of people who thought admitting to a crime when questioned by the police was the right response decreased from nearly 60% at age range 11-13 to less than 20% at age range 18-24. This data shows that a mere difference of seven years has a huge effect on the legal responses of a defendant. Woolard outlined three ways that including more information about adolescent brain development might affect legal practice when representing juveniles charged with committing crimes:

- Change assumptions about juveniles; they are different than adults and their behavior needs to be judged in the context of their development.

- Offer new information and findings to be considered in forensic evaluations, social histories, and presentence reports.

- Aid in explaining interactions and relationships between adolescents and other key players in the court system, probation offices, judges, etc.  in order to help the defendant, understand the legal process.

**Court Application**

Levick described four cases in which the United States Supreme Court has considered neuroscience research when sentencing youth who commit crimes:

- **Roper v. Simmons,** 543 U.S. 551, decided in 2005, dealt with a 17-year-old defendant sentenced to the death penalty in Missouri. The Court ruled that imposing the death penalty on juveniles who commit crimes when they are under age 18 violates the Eighth Amendment's prohibition against cruel and unusual punishment. The decision effectively banned the juvenile death penalty nationwide. The Court considered differences between juveniles and adults, finding that juveniles have less impulse control, increased susceptibility to peer influence, and lack of good reasoning making them less culpable than adults.

- **Graham v. Florida,** 560 U.S. 48, came before the Court in 2010. Sixteen-year-old Graham was convicted of attempted armed robbery and armed burglary. After his release, he violated his probation and was then sentenced to life without parole. The Court ruled that sentencing Graham to life without parole for committing a nonhomicide offense constituted cruel and unusual punishment for juveniles. The science supporting this ruling builds off *Roper*, noting huge fundamental brain differences between adults and children. Juveniles' actions are less likely to demonstrate negative moral character, unlike adults, creating less possibility of repeated offenses and better rehabilitation outcomes.

16

- In 2012, the Court ruled in **Miller v. Alabama,** 132 S.Ct. 2455, that juveniles cannot be subjected to mandatory life without parole. Fifteen-year-old Miller committed a homicide and was given a life sentence without parole. The Court decided sentencing should be conducted on a case-by-case basis, taking factors such as the juvenile's developmental stage and education into account. Three scientific facts supported the Court's reasoning: children lack maturity, which can be seen in their increased impulsivity and risk-taking; children are more vulnerable to negative influences from their environment or peers; and children's moral character is not fully developed, proving that their actions are not necessarily "evidence of irrebuttable depravity." Roper 543 U.S., 569.

- In **J.D.B v. North Carolina,** 131 S.Ct. 2394, decided in 2011, 13-year-old J.D.B was questioned by police and school administrators in his middle school about recent robberies. He was not read his *Miranda* rights or told that he was free to leave and eventually confessed to the robberies. The Court ruled that age is relevant in determining police custody for *Miranda* purposes and that children have a different perception of the legal system. Because they are easily influenced by their environments and peers, children do not understand the legal system and police custody in the same way that an adult would.

These rulings are changing the landscape for juvenile defendants throughout the country. Greater awareness of the differences in adolescent brain development and how they affect juveniles' behaviors is increasingly being recognized by the Court, helping to ensure children are adjudicated more fairly.

**Conclusion**

The convergence of adolescent brain science and the legal system is essential for fair and accurate trials and sentencing of juveniles. Juveniles' developmental context plays a huge role in their legal culpability and should be considered in court. The recent Supreme Court rulings have paved the way for using brain science in court in juvenile cases.

*Morgan Tyler* is student at the College of William & Mary and is participating in the D.C. Summer Leadership & Community Engagement Institute as an intern at the ABA Center on Children and the Law.

https://www.americanbar.org/groups/public_interest/child_law/resources/child_law_practiceonline/child_law_practice/vol-34/august-2015/understanding-the-adolescent-brain-and-legal-culpability/

This would offer the Court some insight into why a young man, with no prior criminal

history or contact with law enforcement, whom has not had a single discipline issue

during his pretrial detention, would attend, and then impulsively ruin his life over a 20 to

30-minute time-period on January 6, 2021.

Getting "caught up in the moment" would have been hard for Nick to avoid.  In

the following article, there is more detail about the adolescent brain and how it develops

through age 24.

"MATURATION OF THE ADOLESCENT BRAIN" Arain, M., Haque, M., Johal, L., Mathur, P., Nel, W., Rais, A., … Sharma, S. (2013). Maturation of the adolescent brain. *Neuropsychiatric Disease and Treatment*, *9*, 449–461. http://doi.org/10.2147/NDT.S39776

Neuropsychiatr Dis Treat. 2013; 9: 449–461.
Published online 2013 Apr 3. doi:  10.2147/NDT.S39776

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3621648/

"Maturation of the adolescent brain"

Mariam Arain, Maliha Haque, Lina Johal, Puja Mathur, Wynand Nel, Afsha Rais, Ranbir Sandhu, and Sushil Sharma

## Abstract

Adolescence is the developmental epoch during which children become adults – intellectually, physically, hormonally, and socially. Adolescence is a tumultuous time, full of changes and transformations. The pubertal transition to adulthood involves both gonadal and behavioral maturation. Magnetic resonance imaging studies have discovered that myelinogenesis, required for proper insulation and efficient neurocybernetics, continues from childhood and the brain's region-specific neurocircuitry remains structurally and functionally vulnerable to impulsive sex, food, and sleep habits. The maturation of the adolescent brain is also influenced by heredity, environment, and sex hormones (estrogen, progesterone, and testosterone), which play a crucial role in myelination. Furthermore, glutamatergic neurotransmission predominates, whereas gamma-aminobutyric acid neurotransmission remains under construction, and this might be responsible for immature and impulsive behavior and neurobehavioral excitement during adolescent life. The adolescent population is highly vulnerable to driving under the influence of alcohol and social maladjustments due to an immature limbic system and prefrontal cortex. Synaptic plasticity and the release of neurotransmitters may also be influenced by environmental neurotoxins and drugs of abuse including cigarettes, caffeine, and alcohol during adolescence. Adolescents may become involved with offensive crimes, irresponsible behavior, unprotected sex, juvenile courts, or even prison. According to a report by the Centers for Disease Control and Prevention, the major cause of death among the teenage population is due to injury and violence related to sex and substance abuse. Prenatal neglect, cigarette smoking, and alcohol consumption may also significantly impact maturation of the adolescent brain. Pharmacological interventions to regulate adolescent behavior have been attempted with limited success. Since several factors, including age, sex, disease, nutritional status, and substance abuse have a significant impact on the maturation of the adolescent brain, we have highlighted the influence of these clinically significant and socially important aspects in this report.

## Introduction

Significant progress has been made over the last 25 years in understanding the brain's regional morphology and function during adolescence. It is now realized that several major morphological

and functional changes occur in the human brain during adolescence.[1] Molecular imaging and functional genomics studies have indicated that the brain remains in an active state of development during adolescence.[1] In particular, magnetic resonance imaging (MRI) studies have discovered that myelinogenesis continues and the neurocircuitry remains structurally and functionally vulnerable to significant increases in sex hormones (estrogen, progesterone, and testosterone) during puberty which, along with environmental input, influences sex, eating, and sleeping habits. Particularly significant changes occur in the limbic system, which may impact self-control, decision making, emotions, and risk-taking behaviors. The brain also experiences a surge of myelin synthesis in the frontal lobe, which is implicated in cognitive processes during adolescence.[1]

Brain maturation during adolescence (ages 10–24 years) could be governed by several factors, as illustrated in Figure 1. It may be influenced by heredity and environment, prenatal and postnatal insult, nutritional status, sleep patterns, pharmacotherapy, and surgical interventions during early childhood. Furthermore, physical, mental, economical, and psychological stress; drug abuse (caffeine, nicotine, and alcohol); and sex hormones including estrogen, progesterone, and testosterone can influence the development and maturation of the adolescent brain. MRI studies have suggested that neurocircuitry and myelinogenesis remain under construction during adolescence because these events in the central nervous system (CNS) are transcriptionally regulated by sex hormones that are specifically increased during puberty.

Figure 1
Factors influencing adolescent brain maturation.

**Notes:** Brain maturation is influenced by heredity and environment, prenatal and postnatal insult, nutritional status, sleep patterns, pharmacotherapy, and surgical interventions during early childhood. Furthermore, physical, mental, economical, and psychological stress; drug abuse (caffeine, nicotine, and ethanol); and sex hormones, including estrogen, progesterone, and testosterone influence the development and maturation of the adolescent brain. MRI studies have suggested that neurocircuitry and myelinogenesis remain under construction during adolescence because these events in the CNS depend on sex hormones that are specifically increased during puberty.

**Abbreviations:** CNS, central nervous system; MRI, magnetic resonance imaging.

Neurobehavioral, morphological, neurochemical, and pharmacological evidence suggests that the brain remains under construction during adolescence,[1,2,3,7,12,21,22,23,27,49] as illustrated in Figure 2. Thus, the consolidation of neurocybernetics occurs during adolescence by the maturation of neurocircuitry and myelination. Although tubulinogenesis, axonogenesis, and synaptogenesis may be accomplished during prenatal and immediate postnatal life, myelinogenesis remains active during adolescent life. Neurochemical evidence suggests that glutamatergic neurotransmission is accomplished during prenatal and immediate postnatal life while gamma-aminobutyric acid (GABA)ergic neurotransmission, particularly in the prefrontal cortex, remains under construction during adolescence.[2] Hence, delayed development of GABAergic neurotransmission is held responsible for neurobehavioral excitement including euphoria and risk-taking behavior, whereas dopaminergic (DA)ergic neurotransmission, particularly in the prefrontal area, is developmentally regulated by sex hormones and is implicated in drug-seeking behavior during adolescence;[3] thus, brain development in critical areas is an ongoing process during adolescence. Indeed, adolescents are risk-taking and novelty-seeking individuals and they are more likely to weigh positive experiences more heavily and negative experiences less so than adults. This

behavioral bias can lead to engagement in risky activities like reckless driving, unprotected sex, and drug abuse.1–3 In fact, most drug addictions initiate during adolescence, and early drug abuse is usually associated with an increased incidence of physical tolerance and dependence. The hormonal changes in puberty contribute to physical, emotional, intellectual, and social changes during adolescence. These changes do not just induce maturation of reproductive function and the emergence of secondary sex characteristics, but they also contribute to the appearance of sex differences in nonreproductive behaviors. Physical changes, including accelerated body growth, sexual maturation, and development of secondary sexual characteristics occur simultaneously along with social, emotional, and cognitive development during adolescence. Furthermore, the adolescent brain evolves its capability to organize, regulate impulses, and weigh risks and rewards; however, these changes can make adolescents highly vulnerable to risk-taking behavior. Thus, brain maturation is an extremely important aspect of overall adolescent development, and a basic understanding of the process might aid in the understanding of adolescent sexual behavior, pregnancy, and intellectual performance issues.

Figure 2
A diagram illustrating various stages of human brain development.

**Notes:** Several neurobehavioral, morphological, neurochemical, and pharmacological evidences suggest that the brain remains under construction during adolescence.1,2,3,7,12,21,22,23,25,42 Tubulinogenesis, axonogenesis, and synaptogenesis may be accomplished during prenatal and immediate postnatal life, yet myelinogenesis remains active during adolescent life. Furthermore, glutamatergic neurotransmission is accomplished during prenatal and immediate postnatal life, while GABAergic neurotransmission in the prefrontal cortex remains under construction. Delayed development of GABAergic neurotransmission among adolescents is implicated in neurobehavioral excitement and risk-taking behavior.

**Abbreviations:** CT, computed tomography; GABAergic, gamma amino butyric acid ergic; MRI, magnetic resonance imaging.

There are several other crucial developmental aspects of adolescence that are associated with changes in physical, cognitive, and psychosocial characteristics, as well as with attitudes toward intimacy and independence, and these may also influence brain maturation; these will also be discussed in the present report. Furthermore, we emphasize the deleterious effects of drug abuse and the clinical significance of nutrition from fish oils and fatty acids in adolescent brain maturation.

Neuronal plasticity and neurocircuitry

The term "plasticity" refers to the possible significant neuronal changes that occur in the acquisition of new skills.1–3 These skills initiate the process of elaboration and stabilization of synaptic circuitry as part of the learning process. Plasticity permits adolescents to learn and adapt in order to acquire independence; however, plasticity also increases an individual's vulnerability toward making improper decisions because the brain's region-specific neurocircuitry remains under construction, thus making it difficult to think critically and rationally before making complex decisions. Moreover, the neurocircuitry may be forged, refined or weakened, and damaged during plasticity. Thus, neuronal proliferation, rewiring, dendritic pruning, and environmental exposure are important components of brain plasticity during adolescence. A significant portion of brain growth and development occurring in adolescence is the construction and strengthening of regional

neurocircuitry and pathways; in particular, the brain stem, cerebellum, occipital lobe, parietal lobe, frontal lobe, and temporal lobe actively mature during adolescence. The frontal lobes are involved in movement control, problem solving, spontaneity, memory, language, initiation, judgment, impulse control, and social and sexual behavior. Furthermore, the prefrontal cortex, which is implicated in drug-seeking behavior, remains in a process of continuous reconstruction, consolidation, and maturation during adolescence.

### The adolescent brain

It is well established that various morphological and physiological changes occur in the human brain during adolescence. The term "adolescence" is generally used to describe a transition stage between childhood and adulthood. "Adolescence" also denotes both teenage years and puberty, as these terms are not mutually exclusive. The second surge of synaptogenesis occurs in the brain during the adolescent years. Hence, adolescence is one of the most dynamic events of human growth and development, second only to infancy in terms of the rate of developmental changes that can occur within the brain. Although there is no single definition of adolescence or a set age boundary, Kaplan[4] has pointed out that puberty refers to the hormonal changes that occur in early youth, and adolescence may extend well beyond the teenage years. In fact, there are characteristic developmental changes that almost all adolescents experience during their transition from childhood to adulthood. It is well established that the brain undergoes a "rewiring" process that is not complete until approximately 25 years of age.[5] This discovery has enhanced our basic understanding regarding adolescent brain maturation and it has provided support for behaviors experienced in late adolescence and early adulthood. Several investigators consider the age span 10–24 years as adolescence, which can be further divided into substages specific to physical, cognitive, and social–emotional development.[5,6] Hence, understanding neurological development in conjunction with physical, cognitive, and social–emotional adolescent development may facilitate the better understanding of adolescent brain maturation, which can subsequently inform proper guidance to adolescents.[7]

Longitudinal MRI studies have confirmed that a second surge of neuronal growth occurs just before puberty.[1,7] This surge is similar to that noticed during infancy and consists of a thickening of the grey matter. Following neuronal proliferation, the brain rewires itself from the onset of puberty up until 24 years old, especially in the prefrontal cortex. The rewiring is accomplished by dendritic pruning and myelination. Dendritic pruning eradicates unused synapses and is generally considered a beneficial process, whereas myelination increases the speed of impulse conduction across the brain's region-specific neurocircuitry. The myelination also optimizes the communication of information throughout the CNS and augments the speed of information processing. Thus, dendritic pruning and myelination are functionally very important for accomplishing efficient neurocybernetics in the adolescent brain.

During adolescence, the neurocircuitry strengthens and allows for multitasking, enhanced ability to solve problems, and the capability to process complex information. Furthermore, adolescent brain plasticity provides an opportunity to develop talents and lifelong interests; however, neurotoxic insult, trauma, chronic stress, drug abuse, and sedentary lifestyles may have a negative impact during this sensitive period of brain maturation.[8,9]

Out of several neurotransmitters in the CNS, three play a significant role in the maturation of adolescent behavior: dopamine, serotonin, and melatonin.[3,8,9] Dopamine influences brain events that control movement, emotional response, and the ability to experience pleasure and pain. Its

levels decrease during adolescence, resulting in mood swings and difficulties regulating emotions. Serotonin plays a significant role in mood alterations, anxiety, impulse control, and arousal. Its levels also decrease during adolescence, and this is associated with decreased impulse control. Lastly, melatonin regulates circadian rhythms and the sleep–wake cycle. The body's daily production of melatonin increases the requirement for sleep during adolescence.[8,9]

### Behavioral problems and puberty

It is now known that hormones are not the only explanation for erratic adolescent behavior; hence, investigators are now trying to establish the exact nature of the interrelationship between pubertal processes and adolescent brain maturation. Dahl has explained three main categories of brain changes related to puberty: (1) changes that precede puberty; (2) changes that are the consequence of puberty; and (3) changes that occur after puberty is over.[9] The timing of these changes may underlie many aspects of risk-taking behavior. These changes, which are the consequence of puberty, occur primarily in the brain regions closely linked to emotions, arousal, motivation, as well as to appetite and sleep patterns. Brain changes independent of puberty are those related to the development of advanced cognitive functioning.

Animal studies have shown that sex hormones (estrogen, progesterone, and testosterone) are critically involved in myelination.[12] These studies have provided a relationship between sex hormones, white matter, and functional connectivity in the human brain, measured using neuroimaging. The results suggest that sex hormones organize structural connections and activate the brain areas they connect. These processes could underlie a better integration of structural and functional communication between brain regions with age. Specifically, ovarian hormones (estradiol and progesterone) may enhance both corticocortical and subcorticocortical functional connectivity, whereas androgens (testosterone) may decrease subcorticocortical functional connectivity but increase the functional connectivity between subcortical brain areas. Therefore, when examining brain development and aging, or when investigating the possible biological mechanisms of neurological diseases, the contribution of sex hormones should not be ignored.[10]

A recent study has described how the social brain develops during adolescence.[10] Adolescence is a time characterized by change – hormonally, physically, psychologically, and socially. Functional MRI studies have demonstrated the developmental changes that occur during adolescence among white matter and grey matter volumes in regions within the "social brain."[1,7,12] Activity in the mesolimbic brain regions also showed changes between adolescence and adulthood during social cognition tasks. A developmental clock – along with the signals that provide information on somatic growth, energy balance, and season of the year – times the awakening of gonadotropin-releasing hormone (GnRH) neurons at the onset of puberty. High-frequency GnRH release results in the disinhibition and activation of GnRH neurons at the onset of puberty, leading to gametogenesis and an increase in sex hormone secretion. Sex hormones and adrenocorticotropic hormones both remodel and activate neurocircuits during adolescent brain development, leading to the development of sexual salience of sensory stimuli, sexual motivation, and expression of copulatory behavior. These influences of hormones on reproductive behavior depend on changes in the adolescent brain that occur independently of gonadal maturation. Reproductive maturity is therefore the product of developmentally timed, brain-driven, and recurrent interactions between steroid hormones and the adolescent nervous system.[11,12]

### Limbic system

The limbic system is a group of structures located deep within the cerebrum. It is composed of the amygdala, the hippocampus, and the hypothalamus. These brain regions are involved in the expression of emotions and motivation, which are related to survival. The emotions include fear,

anger, and the fight or fight response. The limbic system is also involved in feelings of pleasure that reward behaviors related to species survival, such as eating and sex. In addition, the limbic system regulates functions related to memory storage and retrieval of events that invoke a strong emotional response. Neuroimaging studies have revealed that when interacting with others and making decisions, adolescents are more likely than adults to be swayed by their emotions.[12]–[16] In addition, adolescents often read others' emotions incorrectly. These studies involved comparing a teen brain to an adult brain determined that adolescents' prefrontal cortices are used less often during interpersonal interactions and decision making than their adult counterparts. In fact, adolescents relied more on the emotional region of their brains when reading others' emotions, which is more impulsive when compared to a logical or measured interpretation. Thus, an understanding of how the limbic system and the prefrontal cortex are used has provided a partial explanation for certain characteristics of adolescents and adolescent behaviors, such as quickness to anger, intense mood swings, and making decisions on the basis of "gut" feelings. Because adolescents rely heavily on the emotional regions of their brains, it can be challenging to make what adults consider logical and appropriate decisions, as illustrated in Figure 3.

Figure 3
A diagram illustrating the developmental regulation of executive functions by the prefrontal cortex, which remains under construction during adolescence.

**Notes:** Several executive brain functions are governed by the prefrontal cortex, which remains in a state of active maturation during adolescence. These complex brain functions are regulated by the prefrontal cortex as illustrated in this figure (based on the original discoveries by Gedd and Steinberg).[1,21]–[23,25] Due to immature functional areas in the prefrontal cortex, adolescent teens may take part in risk seeking behavior including unprotected sex, impaired driving, and drug addiction.

Prefrontal cortex

Recently, investigators have studied various aspects of the maturation process of the prefrontal cortex of adolescents.[17,18] The prefrontal cortex offers an individual the capacity to exercise good judgment when presented with difficult life situations. The prefrontal cortex, the part of the frontal lobes lying just behind the forehead, is responsible for cognitive analysis, abstract thought, and the moderation of correct behavior in social situations. The prefrontal cortex acquires information from all of the senses and orchestrates thoughts and actions in order to achieve specific goals.

The prefrontal cortex is one of the last regions of the brain to reach maturation, which explains why some adolescents exhibit behavioral immaturity. There are several executive functions of the human prefrontal cortex that remain under construction during adolescence, as illustrated in Figures 3 and and4.4. The fact that brain development is not complete until near the age of 25 years refers specifically to the development of the prefrontal cortex.[19]

Figure 4
An algorithmic diagram illustrating the management of emotions and motivation by the limbic system in the adolescent brain.

**Notes:** The nucleus accumbens and amygdala are the two most prominent parts of the central nervous system involved in riskier behavior and increased sex drive among teenage adolescents. The nucleus accumbens is highly sensitized to accomplish desirable goals. A decrease in dopamine

in the nucleus accumbens is involved in increased vulnerability to drug addiction and risky decisions. Sex hormones (estrogen and testosterone) bind with their receptors to induce increased sex drive and emotional volatility and impulsivity. Due to an immature prefrontal cortex, adolescents also have an increased sex drive and problems in self-regulation as illustrated in this flow diagram.[19,23,26,27,54]

MRI studies have discovered that developmental processes tend to occur in the brain in a back-to-front pattern, explaining why the prefrontal cortex develops last. These studies have also shown that teens have less white matter (myelin) in the frontal lobes compared to adults, and that myelin in the frontal lobes increases throughout adolescence.[1,7,21] With more myelin comes the growth of important neurocircuitry, allowing for better flow of information between brain regions.[20,21] These findings have led to the concept of frontalization, whereby the prefrontal cortex develops in order to regulate the behavioral responses initiated by the limbic structures. During adolescence, white matter increases in the corpus callosum, the bundle of nerve fibers connecting the right and left hemispheres of the brain, which allows for efficient communication between the hemispheres and enables an individual to access a full array of analytical and creative strategies to respond to complex dilemmas that may arise in adolescent life. Hence, the role of experience is critical in developing the neurocircuitry that allows for increased cognitive control of the emotions and impulses of adolescence. Adolescents, who tend to engage in risky behaviors in relatively safe environments, utilize this circuitry and develop the skills to tackle more dangerous situations; however, with an immature prefrontal cortex, even if adolescents understand that something is dangerous, they may still engage in such risky behavior.[21]

Risk-taking behavior

The exact biological basis of risk-taking behavior in adolescents remains enigmatic. Adolescents are at their peak of physical strength, resilience, and immune function, yet mortality rates among 15–24 year olds are more than triple the mortality rates of middle school children. The Centers for Disease Control and Prevention has identified the leading causes of death and illness among adolescents,[22,23,59] as illustrated in Figure 5. It is generally held that adolescents take risks to test and define themselves, as risk-taking can be both beneficial and harmful. It can lead to situations where new skills are learned and new experiences can prepare them for future challenges in their lives. Risk-taking serves as a means of discovery about oneself, others, and the world at large. The proclivity for risk-taking behavior plays a significant role in adolescent development, rendering this a period of time for both accomplishing their full potential and vulnerability. Hence, acquiring knowledge regarding adolescent brain maturation can help understand why teens take risks, while keeping in mind that risk-taking behavior is a normal and necessary component of adolescence. This knowledge may help in developing physiologically and pharmacologically effective interventions that focus on reducing the negative consequences associated with risk-taking behavior among the adolescent population.[22]

Figure 5
Leading cause of death among adolescents (10–24 years).

**Notes:** Injury and violence are the two most common leading causes of death during adolescence. Out of 19 million adolescents (15–24 years) in the US that were diagnosed with HIV/AIDS, 39% admitted that they had unprotected sex. In addition to risky sex behavior, 30% of adolescents had been involved in motor vehicle accidents, with 41% of these linked to deaths; 12% committed suicide; and 15% were victims of homicide as illustrated in this figure (Steinberg 2004, Centers for Disease Control and Prevention).[18]

**Abbreviations:** AIDS, acquired immune deficiency syndrome; HIV, human immunodeficiency virus; M, million; STD, sexually transmitted disease.

Risk perception

It has been established that, around the age of 12 years, adolescents decrease their reliance on concrete thinking and begin to show the capacity for abstract thinking, visualization of potential outcomes, and a logical understanding of cause and effect.[23] Teens begin looking at situations and deciding whether they are safe, risky, or dangerous. These aspects of development correlate with the maturation of the frontal lobe and is marked by a shift from the development of additional neural connections to synaptic pruning, as well as by an increase in the release of hormones, all of which drive an adolescent's mood and impulsive behavior.

By the age of 15 years, there is little difference in adolescents' and adults' decision-making patterns pertaining to hypothetical situations. Teens were found to be capable of reasoning about the possible harm or benefits of different courses of action; however, in the real world, teens still engaged in dangerous behaviors, despite understanding the risks involved.[22,23,59] Hence, both the role of emotions and the connection between feeling and thinking need to be considered while studying the way teens make decisions.

Investigators have differentiated between "hot" cognition and "cold" cognition.[24] Hot cognition is described as thinking under conditions of high arousal and intense emotion. Under these conditions, teens tend to make poorer decisions. The opposite of hot cognition is cold cognition, which is critical and over-analyzing.[25] In cold cognition, circumstances are less intense and teens tend to make better decisions. Then, with the addition of complex feelings – such as fear of rejection, wanting to look cool, the excitement of risk, or anxiety of being caught – it is more difficult for teens to think through potential outcomes, understand the consequences of their decisions, or even use common sense.[26] The apparent immaturity of the connections between the limbic system, prefrontal cortex, and the amygdala provides further support for this concept.

Sensation seeking

The nucleus accumbens, a part of the brain's reward system located within the limbic system, is the area that processes information related to motivation and reward. Brain imaging has shown that the nucleus accumbens is highly sensitive in adolescents, sending out impulses to act when faced with the opportunity to obtain something desirable.[27] For instance, adolescents are more vulnerable to nicotine, alcohol, and other drug addictions because the limbic brain regions that govern impulse and motivation are not yet fully developed.[28] During puberty, the increases in estrogen and testosterone bind receptors in the limbic system, which not only stimulates sex drive, but also increases adolescents' emotional volatility and impulsivity. Changes in the brain's reward sensitivity that occur during puberty have also been explored. These changes are related to decreases in DA, a neurotransmitter that produces feelings of pleasure.[29] Due to these changes, adolescents may require higher levels of DAergic stimulation to achieve the same levels of pleasure/reward, driving them to make riskier decisions.

Self-regulation

Self-regulation has been broadly classified as the management of emotions and motivation.[30] It also involves directing and controlling behavior in order to meet the challenges of the environment

and to work toward a conscious purpose. Self-regulation also entails controlling the expression of intense emotions, impulse control, and delayed gratification. As adolescents progress toward adulthood with a body that is almost mature, the self-regulatory parts of their brains are still maturing. An earlier onset of puberty increases the window of vulnerability for teens, making them more susceptible to taking risks that affect their health and development over a prolonged period.[31]

Behavioral control requires a great involvement of cognitive and executive functions. These functions are localized in the prefrontal cortex, which matures independent of puberty and continues to evolve up until 24 years of age. It has been suggested that, during this period, adolescents should not be overprotected, but be allowed to make mistakes, learn from their own experiences, and practice self-regulation. Parents and teachers can help adolescents through this period by listening and offering support and guidance.

Recently, Steinberg studied risk-taking behavior in teens and how this was influenced by their peers.[32] He used a driving simulation game in which he studied teens deciding on whether or not to run a yellow light, and found that when teens were playing alone they made safer decisions, but in the presence of friends they made riskier decisions. When teens find themselves in emotionally arousing situations, with their immature prefrontal cortices, hot cognitive thinking comes into play, and these adolescents are more likely to take riskier actions and make impulsive decisions.

Societal influences

Mass media, community, and adult role models can also influence adolescent risk-taking behaviors. Teens are constantly exposed to emotionally arousing stimuli through multimedia, which encourages unprotected sex, substance abuse, alcohol abuse, and life-threatening activities.[32,33] Even neighborhoods, friends, and communities provide teens with opportunities to engage in risky behaviors, although local law enforcement authorities regulate the purchase of cigarettes, access to and acceptability of guns, and the ability to drive cars. Even adults can have trouble resisting engaging in some of these risky behaviors; however, the temptation must be much harder for teens, whose judgment and decision-making skills are still developing.[34]

Recent functional MRI studies have demonstrated the extent of development during adolescence in the white matter and grey matter regions within the social brain. Activity in some of these regions showed changes between adolescence and adulthood during social cognition tasks. These studies have provided evidence that the concept of mind usage remains developing late in adolescence.[1,21,33]

Substance abuse

The mechanisms underlying the long-term effects of prenatal substance abuse and its consequent elevated impulsivity during adolescence are poorly understood. Liu and Lester[34] have reported on developmentally-programmed neural maturation and highlighted adolescence as a critical period of brain maturation. These investigators have studied impairments in the DAergic system, the hypothalamic–pituitary–adrenal axis, and the pathological interactions between these two systems that originate from previous fetal programming in order to explain insufficient behavioral inhibition in affected adolescents. In addition, Burke[35] has examined the development of brain functions and the cognitive capabilities of teenagers. Specifically, these two sets of investigators have explored the effect of alcohol abuse on brain development, and the fundamental cognitive differences between adolescents and adults, and have suggested that the adultification of youth is harsh for

those whose brains have not fully matured.

*Cannabis*

Cannabis is the most commonly consumed drug among adolescents, and its chronic use may affect maturational refinement by disrupting the regulatory role of the endocannabinoid system.[36] Adolescence represents a critical period for brain development and the endocannabinoid system plays a critical role in the regulation of neuronal refinement during this period. In animals, adolescent cannabinoid exposure caused long-term impairment in specific components of learning and memory, and differentially affected emotional reactivity with milder effects on anxiety behavior and more pronounced effects on depressive behavior.[37] Epidemiological studies have suggested that adolescent cannabis abuse may increase their risk of developing cognitive abnormalities, psychotic illness, mood disorders, and other illicit substance abuse later in life.[36,38–40] Cannabis abuse in adolescence could increase the risk of developing psychiatric disorders, especially in people who are vulnerable to developing psychiatric syndromes. So far, only a few studies have investigated the neurobiological substrates of this vulnerability;[56] hence, further investigation is required to clarify the molecular mechanisms underlying the effect of cannabis on the adolescent brain.

*Nicotine*

Recent studies have provided a neural framework to explain the developmental differences that occur within the mesolimbic pathway based on the established role of DA in addiction.[41,42] During adolescence, excitatory glutamatergic systems that facilitate DAergic neurotransmisson are overdeveloped, whereas inhibitory GABAergic systems remain underdeveloped. DAergic pathways originate in the ventral tegmental area and terminate in the nucleus accumbens, where dopamine is increased by nicotine, but decreased during withdrawal. Thus, it has been hypothesized that adolescents display enhanced nicotine reward and reduced withdrawal via enhanced excitation and reduced inhibition of ventral tegmental area cell bodies that release DA in the nucleus accumbens.[44,45] Although this framework focuses on both adolescents and adults, it may also apply to the enhanced vulnerability to nicotine in adults that were previously exposed to nicotine during adolescence, suggesting that the diagnostic criteria developed for nicotine dependence in adults (based primarily on withdrawal) may be inappropriate during adolescence, when nicotine withdrawal does not appear to play a major role in nicotine use.[39] Furthermore, treatment strategies involving nicotine replacement may be harmful for adolescents because it may cause enhanced vulnerability to nicotine dependence later in adulthood. Adolescents that initiate tobacco abuse are more vulnerable to long-term nicotine dependence. A unifying hypothesis has been proposed based on animal studies, and it suggests that adolescents (as compared to adults) experience enhanced short-term positive effects and reduced adverse effects toward nicotine, and they also experience fewer negative effects during nicotine withdrawal.[39] Thus, during adolescence, the strong positive effects associated with nicotine are inadequately balanced by the negative effects that contribute to nicotine dependence in adults.

*Alcohol*

Recently, the development of brain functions, the cognitive capabilities of adolescents, and the effect of alcohol abuse on brain maturation have been examined.[49,50] Cognitive differences between adolescents and adults suggest that the adultification of youths is deleterious for youths whose brains have not fully matured. Adolescence is the time during which most individuals first

experience alcohol exposure, and binge drinking is very common during this period.[29,50,43] There is increasing evidence for long-lasting neurophysiological changes that may occur following exposure to ethanol during adolescence in animal models.[50] If alcohol exposure is neurotoxic to the developing brain during adolescence, then understanding how ethanol affects the developing adolescent brain becomes a major public health issue. Adolescence is a critical time period when cognitive, emotional, and social maturation occurs and it is likely that ethanol exposure may affect these complex processes. During a period that corresponds to adolescence in rats, the relatively brief exposure to high levels of alcohol via ethanol vapors caused long-lasting changes in functional brain activity.[51] The following observations were recorded: disturbances in waking electroencephalography; a reduction in the P3 wave (P3a and P3b) component of event-related potential measurements; reductions in the mean duration of slow-wave sleep; and the total amount of time spent in slow-wave sleep – findings that are consistent with the premature sleep patterns observed during aging.[50]

Sex differences

Sex differences in many behaviors, including drug abuse, have been attributed to social and cultural factors.[43,46] A narrowing gap in drug abuse between adolescent boys and girls supports this hypothesis;[52] however, some sex differences in addiction vulnerability reflect biologic differences in the neurocircuits involved in addiction. A male predominance in overall drug abuse appears by the end of adolescence, while girls develop a rapid progression from the time of the first abuse to dependence, and this represents female-based vulnerability. Recent studies have emphasized the contribution of sex differences in the function of the ascending DAergic systems, which are critical in reinforcement.[3,43] These studies highlight the behavioral, neurochemical, and anatomical changes that occur in the DAergic functions that are related to the addictions that occur during adolescence. In addition, these studies have presented novel findings about the emergence of sex differences in DAergic function during adolescence.[43,46–48] Sex differences in drinking patterns and the rates of alcohol abuse and dependence begin to emerge during the transition from late puberty to young adulthood. Increases in pubertal hormones, including gonadal and stress hormones, are a prominent developmental feature of adolescence and could contribute to the progression of sex differences in alcohol drinking behavior during puberty. Witt[46] reviewed experimental and correlational studies of gonadal and stress-related hormone changes, as well as their effects on alcohol consumption and the associated neurobehavioral actions of alcohol on the mesolimbic dopaminergic system. Mechanisms have been suggested by which reproductive and stress-related hormones may modulate neural circuits within the brain reward system, and these hormones may produce sex differences in terms of alcohol consumption patterns and adolescents' vulnerability to alcohol abuse and dependence, which become apparent during the late pubertal period.

Chemotherapy

Recently, Vázquez et al[53] emphasized the need for the early and accurate diagnosis of CNS complications during and after pediatric cancer treatment because of the improvement in overall survival rates related to innovative and aggressive oncologic therapies. A major concern in this issue is recognizing the radiologic features of these CNS complications. Radiologists are supposed to be familiar with the early and late effects of cancer therapy in the pediatric CNS (toxic effects, infection, endocrine or sensory dysfunction, neuropsychological impairment, and secondary malignancies) in order to provide an accurate diagnosis and to minimize morbidity. The acquisition

of further knowledge about these complications will enable the development of more appropriate therapeutic decisions, effective patient surveillance, and an improved quality of life by decreasing the long-term consequences in survivors. Certain chemotherapeutic compounds and environmental agents, such as anesthetics, antiepileptics, sleep-inducing and anxiolytic compounds, nicotine, alcohol, and stress, as well as agents of infection have also been investigated quite extensively and have been shown to contribute to the etiopathogenesis of serious neuropsychiatric disorders.[54] All of these agents have a deleterious influence on developmental processes during the time when the brain experiences major changes in early childhood and during adulthood. Several of these agents have contributed to the structural and functional brain abnormalities that have been observed in the biomarker profiles of schizophrenia and fetal alcohol syndrome. The effects of these agents are generally permanent and irreversible.[54]

Nutrition

The rapid expansion of knowledge in this field, from basic science to clinical and community-based research, is expected to lead to urgently needed research in support of effective, evidence-based medicine and treatment strategies for undernutrition, overnutrition, and eating disorders in early childhood. Eating is necessary for survival and provides a sense of pleasure, but may be perturbed, leading to undernutrition, overnutrition, and eating disorders. The development of feeding in humans relies on the complex interplay between homeostatic mechanisms; neural reward systems; and adolescents' motor, sensory, and emotional capabilities. Furthermore, parenting, social factors, and food influence the development of eating behavior.

Recently, the neural development of eating behavior in children has been investigated.[55] Furthermore, developmentally programmed neural maturation has been discussed in order to highlight adolescence as the second most critical period of brain maturation.[56] These studies used impairments of the DAergic system, the hypothalamic–pituitary–adrenal axis, and pathological interactions between these two systems originating from fetal programming in a dual-system model to explain insufficient behavioral inhibition in affected adolescents.

The range of exogenous agents, such as alcohol and cocaine, which are generally likely to detrimentally affect the development of the brain and CNS defies estimation, although the accumulated evidence is substantial.[57–60] Pubertal age affects the fundamental property of nervous tissue excitability; excessive excitatory drive is seen in early puberty and a deficiency is seen in late puberty. It has been postulated that, with adequate fish oils and fatty acids, the risk of psychopathology can be minimized, whereas a deficiency could lead to subcortical dysfunction in early puberty, and a breakdown of cortical circuitry and cognitive dysfunctions in late puberty.[61] Thus, post pubertal psychoses, schizophrenia, and manic–depressive psychosis during the pubertal age, along with excitability, may be the result of continuous dietary deficiency, which may inhibit the expression of the oligodendrocyte-related genes responsible for myelinogenesis. The beneficial effect of fish oils and fatty acids in schizophrenia, fetal alcohol syndrome, developmental dyslexia, attention deficit hyperactivity disorder, and in other CNS disorders supports the hypothesis that the typical diet might be persistently deficient in the affected individuals, as illustrated in Figure 6. However, the amount of fish oils and fatty acids needed to secure normal brain development and function is not known. It seems conjectural to postulate that a dietary deficiency in fish oils and fatty acids is causing brain dysfunction and death; however, all of these observations tend to suggest that a diet focusing on mainly protein is deficient, and the deficiency is most pronounced in maternal nutrition and in infancy, which might have a deleterious impact on the maturation of the adolescent brain.

Figure 6
Effect of seafood on the maturation of the adolescent brain.

**Notes:** MRI studies have provided evidence that in addition to the prefrontal cortex and limbic system, myelinogenesis and neurocircuitry remains under construction during adolescence.1,7,19,21 Myelinogenesis requires precursors such as polyunsaturated fatty acids, of which many seafoods are a rich source. Hence, consuming seafood may accelerate brain maturation in adolescents. However, malnutrition and substance abuse may inhibit maturation of the adolescent brain. (+) induction; (−) inhibition.

## Conclusion

Neuromorphological, neurochemical, neurophysiological, neurobehavioral, and neuropharmacological evidence suggests that the brain remains in its active state of maturation during adolescence.1,7,19,21 Such evidence supports the hypothesis that the adolescent brain is structurally and functionally vulnerable to environmental stress, risky behavior, drug addiction, impaired driving, and unprotected sex. Computed tomography and MRI studies also provide evidence in support of this hypothesis.19

Brain maturation occurs during adolescence due to a surge in the synthesis of sex hormones implicated in puberty including estrogen, progesterone, and testosterone. These sex hormones augment myelinogenesis and the development of the neurocircuitry involved in efficient neurocybernetics. Although tubulinogenesis, axonogenesis, and synaptogenesis can occur during the prenatal and early postnatal periods, myelinogenesis involved in the insulation of axons remains under construction in adolescence. Sex hormones also significantly influence food intake and sleep requirements during puberty. In addition to dramatic changes in secondary sex characteristics, sex hormones may also influence the learning, intelligence, memory, and behavior of adolescents.

Furthermore, it can be observed that the development of excitatory glutamatergic neurotransmission occurs earlier in the developing brain as compared to GABAergic neurotransmission, which makes the pediatric population susceptible to seizures.

The development and maturation of the prefrontal cortex occurs primarily during adolescence and is fully accomplished at the age of 25 years. The development of the prefrontal cortex is very important for complex behavioral performance, as this region of the brain helps accomplish executive brain functions.

A detailed study is required in order to determine the exact biomarkers involved, as well as the intricate influence of diet, drugs, sex, and sleep on the maturation of the adolescent brain as discussed briefly in this report.

## Acknowledgments

The moral support and encouragement of President Kallol Guha is gratefully acknowledged.

## Footnotes

**Disclosure**

The authors report no conflicts of interest in this report.

References

1. Giedd JN, Blumenthal J, Jeffries NO, et al. Brain development during childhood and adolescence: a longitudinal MRI study. Nat Neurosci. 1999;2(10):861–863. [PubMed]

2. Li K, Xu E. The role and the mechanism of gamma-aminobutyric acid during central nervous system development. Neurosci Bull. 2008;24(3):195–200. [PubMed]

3. Wahlstrom D, Collins P, White T, Luciana M. Developmental changes in dopamine neurotransmission in adolescence: behavioral implications and issues in assessment. Brain Cogn. 2010;72(1):146–159.[PMC free article] [PubMed]

4. Kaplan PS. Adolescence. Boston, MA: Houghton Miffin Company; 2004.

5. Gavin L, MacKay AP, Brown K, et al. Centers for Disease Control and Prevention (CDC) Sexual and reproductive health of persons aged 10–24 years – United States, 2002–2007. MMWR Surveill Summ. 2009;58(6):1–58. [PubMed]

6. Sylwester R. The Adolescent Brain: Reaching for Autonomy. Newbury Park (CA): Corwin Press; 2007.

7. Baird AA, Gruber SA, Fein DA, et al. Functional magnetic resonance imaging of facial affect recognition in children and adolescents. J Am Acad Child Adolesc Psychiatry. 1999;38(2):195–199.[PubMed]

8. Frontline: Inside the Teenage Brain [webpage on the Internet] Arlington (TX)Public Broadcasting Service; 2002Available from: http://www.pbs.org/wgbh/pages/frontline/shows/teenbrain/Accessed August 6, 2009

9. Dahl RE. Beyond raging hormones: the tinderbox in the teenage brain. Cerebrum. 2003;5(3):7–22.

10. Blakemore SJ. Development of the social brain in adolescence. J R Soc Med. 2012;105(3):111–116.[PMC free article] [PubMed]

11. Sisk CL, Foster DL. The neural basis of puberty and adolescence. Nat Neurosci. 2004;7(10):1040–1047. [PubMed]

12. Peper JS, van den Heuvel MP, Mandl RC, Hulshoff Pol HE, van Honk J. Sex steroids and connectivity in the human brain: a review of neuroimaging studies. Psychoneuroendocrinology. 2011;36(8):1101–1113.[PubMed]

13. Choudhury S, Blakemore SJ, Charman T. Social cognitive development during adolescence. Soc Cogn Affect Neurosci. 2006;1(3):165–174. [PMC free article] [PubMed]

14. den Bos W.V. Doctoral Research Thesis. Amsterdam: 2011. The neurocognitive development of social decision making; pp. 1–189.

15. Somerville LH, Fani N, Erin B. McClure-Tone E.B. Behavioral and neural representation of emotional facial expressions across the lifespan. Dev Neuropsychol. 2011;36(4):408–428. [PMC free article][PubMed]

16. Sales JM, Irvin CE. Theories of adolescent risk taking 2009 The biopsychological model. In: Diclemente R.J, Santelli J.S, Crosby RA, editors. Adolescent Health. San Fransisco: John Wiley and Sons; pp. 31–50.

17. Frontline: Interview Deborah Yurgelun-Todd [webpage on the Internet] Arlington: Public Broadcasting Service; 2002Available form: http://www.pbs.org/wgbh/pages/frontline/shows/teenbrain/interviews/todd.htmlAccessed February 14, 2013

18. Guyer AE, McClure-Tone EB, Shiffrin ND, Pine DS, Nelson EE. Probing the neural correlates of anticipated peer evaluation in adolescence. Child Dev. 2009;80(4):1000–1015. [PMC free article][PubMed]

19. Casey BJ, Jones RM, Hare TA. The adolescent brain. Ann NY Acad Sci. 2008;1124:111–126.[PMC free article] [PubMed]

20. Walsh D, Bennett N. Why Do They Act That Way? A Survival Guide to the Adolescent Brain for You and Your Teen. New York: Simon and Schuster; 2004.

21. Giedd JN. Structural magnetic resonance imaging of the adolescent brain. Ann NY Acad Sci. 2004;1021:77–85. [PubMed]

22. Steinberg L. Risk taking in adolescence: what changes and why? Ann NY Acad Sci. 2004;1021:51–58.[PubMed]

23. Steinberg L. Cognitive and affective development in adolescence. Trends Cogn Sci. 2005;9(2):69–76.[PubMed]

24. Abelson RP. Computer simulation of "hot cognition" In: Tomkins S.S, Messick S, editors. Computer simulation of personality. New York: Wiley; 1963. pp. 277–302.

25. Ziva K. The case for motivated reasoning. Psychological Bulletin. 1990;108(3):480–498. [PubMed]

26. Benes FM. The development of the human frontal cortex: The maturation of neurotransmitter system and their interactions. In: Nelson CA, Luciana M, editors. Handbook of Developmental Cognitive Neuroscience. Cambridge, MA: MIT Press; 2001. pp. 79–92.

27. Gardner M, Steinberg L. Peer Infuence on risk taking, risk preference and risky decision-making in adolescence and adulthood. Dev Psychol. 2005;41(4):625–635. [PubMed]

28. http://www.hhs.gov [homepage on the Internet] New Research on Adolescent Brain Development Center for Substance Abuse Prevention; 2004http://www.hhs.gov/opa/familylife/tech_assistance/etraining/adolescent_brain/risk_taking/changes/sensation_seeking/index.html#fn3Accessed March 14, 2013

29. Lopez B, Schwartz SJ, Prado G, Campo AE, Pantin H. Adolescent neurological development and implications for adolescent substance abuse prevention. J Prim Prev. 2008;29(1):5–35. [PubMed]

30. Steinberg L, Belsky J. An evolutionary perspective on psychopathology in adolescence. In: Cicchetti D, Toth SL, editors. Adolescence: Opportunities and Challenges: Volume 7 of Rochester Symposium on Developmental Psychology Series. Rochester, NY: University of Rochester Press; 1996. pp. 93–124.

31. Simpson RA. Raising Teens: A Synthesis of Research and a Foundation for Action. Center for Health Communication, Harvard School of Public Health; 2001. Available from:http://www.hsph.harvard.edu/chc/parenting/report.pdf.

32. Steinberg L. A social neuroscience perspective on adolescent risk-taking. Dev Rev. 2008;28(1):78–106.[PMC free article] [PubMed]

33. Blakemore SJ. Development of the social brain in adolescence. J R Soc Med. 2012;105(3):111–116.[PMC free article] [PubMed]

34. Liu J, Lester BM. Reconceptualizing in a dual-system model the effects of prenatal cocaine exposure on adolescent development: a short review. Int J Dev Neurosci. 2011;29(8):803–809. [PubMed]

35. Burke AS. Under construction: brain formation, culpability, and the criminal justice system. Int J Law Psychiatry. 2011;34(6):381–385. [PubMed]

36. Palmer RH, Young SE, Hopfer CJ, et al. Developmental epidemiology of drug use and abuse in adolescence and young adulthood: evidence of generalized risk. Drug Alcohol Depend. 2009;102(1–3):78–87. [PMC free article] [PubMed]

37. Bossong NG, Niesink RJ. Adolescent brain maturation, the endogenous cannabinoid system and the neurobiology of cannabis-induced schizophrenia. Prog Neurobiol. 2010 Nov;92(3):370–385. [PubMed]

38. Vik P, Brown SA. Life events and substance abuse during adolescence. In: Miller TW, editor. Children of Trauma. Madison, CT: International Universities Press; 1998. pp. 179–204.

39. Rubino T, Zamberletti E, Parolaro D. Adolescent exposure to cannabis as a risk factor for psychiatric disorders. J Psychopharmacol. 2012;26(1):177–188. [PubMed]

40. Gonzalez R, Swanson JM. Long-term effects of adolescent-onset and persistent use of cannabis. Proc Natl Acad Sci USA. 2012;109(40):15970–15971. [PMC free article] [PubMed]

41. O'Dell LE. A psychobiological framework of the substrates that mediate nicotine use during adolescence. Neuropharmacology. 2009;56(Suppl 1):263–278. [PMC free article] [PubMed]

42. Philpot R, Kirstein C. Developmental Differences in the Accumbal Dopaminergic Response to Repeated Ethanol Exposure. Ann. NY. Acad. Sci. 2004;1021:422–426. [PubMed]

43. Kuhn C, Johnson M, Thomae A, et al. The emergence of gonadal hormone influences on dopaminergic function during puberty. Horm Behav. 2010;58(1):122–137. [PMC free article] [PubMed]

44. Burke AS. Under construction: brain formation, culpability, and the criminal justice system. Int J Law Psychiatry. 2011;34(6):381–385. [PubMed]

45. Spear LP. Adolescent period: biological basis of vulnerability to develop alcoholism and other ethanol–mediated behaviors. In: Noronha A, Eckardt M, Warren K, editors. Review of NiAAA's Neuroscience and Behavioral Research Portfolio. Bethesda, MD: National Institute on Alcohol Abuse and Alcoholism; 2000. pp. 315–333.

46. Witt ED. Puberty, hormones, and sex differences in alcohol abuse and dependence. Neurotoxicol Teratol. 2007;29(1):81–95. [PubMed]

47. Nolen-Hoeksema S, Girgus JS. The emergence of gender differences in depression during adolescence. Psychological Bulletin. 1994;115(3):424–443. [PubMed]

48. Lenroot RK, Giedd JN. Sex differences in the adolescent brain. Brain Cogn. 2010;72(1):1–19.[PMC free article] [PubMed]

49. Spear LP. The adolescent brain and age–related behavioral manifestations. Neurosci Biobehav Rev. 2000;24(4):417–463. [PubMed]

50. Ehlers CL, Criado JR. Adolescent ethanol exposure: does it produce long-lasting electrophysiological effects? Alcohol. 2010;44(1):27–37. [PMC free article] [PubMed]

51. Allen CD, Lee S, Koob GF, Rivier C. Immediate and prolonged effects of alcohol exposure on the activity of the hypothalamic-pituitary-adrenal axis in adult and adolescent rats. Brain Behav Immun. 2011 Jun;25(Suppl 1):S50–S60. [PMC free article] [PubMed]

52. Schulte MT, Ramo D, Brown SA. Gender Differences in Factors Infuencing Alcohol Use and Drinking Progression Among Adolescents. Clin Psychol Rev. 2009 Aug;29(6):535–547. [PMC free article][PubMed]

53. Vázquez E, Delgado I, Sánchez-Montañez A, Barber I, Sánchez-Toledo J, Enríquez G. Side effects of oncologic therapies in the pediatric central nervous system: update on neuroimaging findings. Radiographics. 2011;31(4):1123–1139. [PubMed]

54. Archer T. Effects of exogenous agents on brain development: stress, abuse and therapeutic compounds. CNS Neurosci Ther. 2011;17(5):470–489. [PubMed]

55. Gahagan S. Development of eating behavior: biology and context. J Dev Behav Pediatr. 2012;33(3):261–271. [PMC free article] [PubMed]

56. Sisk CL, Foster DL. The neural basis of puberty and adolescence. Nature Neuroscience. 2004;7:1040–1047. [PubMed]

57. Liu J, Lester BM. Reconceptualizing in a dual-system model the effects of prenatal cocaine exposure on adolescent development: a short review. Int J Dev Neurosci. 2011;29(8):803–809. [PubMed]

58. Saugstad LF. From superior adaptation and function to brain dysfunction – the neglect of epigenetic factors. Nutr Health. 2004;18(1):3–27. [PubMed]

59. Steinberg L. Risk taking in adolescence: new perspectives from brain and behavioral science. Curr Dir Psychol Sci. 2007;16(2):55–59.
60. Brown SA, Tapert SF, Granholm E, Delis DC. Neurocognitive functioning of adolescents: effects of protracted alcohol use. Alcohol Clin Exp Res. 2000;24(2):164–171. [PubMed]
61. Rayyan M, Devlieger H, Jochum F, Allegaert K. Short-Term Use of Parenteral Nutrition With a Lipid Emulsion Containing a Mixture of Soybean Oil, Olive Oil, Medium-Chain Triglycerides, and Fish Oil. A Randomized Double-Blind Study in Preterm Infants. JPEN J Parenter Enteral Nutr. 2012 Jan;36(1 suppl):81S–94S. [PMC free article] [PubMed]"

The undersigned does not suggest incompetency, nor suggest excuse. The information

supra aids this Court in considering Nick's young age and offers some insight as to

why Nick acted impulsively and out of character when leading an otherwise normal,

productive, law-abiding life.

**2.      The Need for the Sentence Imposed to Promote Certain Statutory Objectives**:

   **(a) To reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense**

The need for punishment is measured by the degree of "blameworthiness," which "is

generally assessed according to two kinds of elements: the nature and seriousness of the harm

caused or threatened by the crime, in particular, their degree of intent (mens rea), motives, role in

the offense, and mental illness or other diminished capacity." Richard S. Frase, *Excessive Prison*

*Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?,* 89

Minn. L. Rev. 571, 590 (February 2005).

Additionally, A Defendant's motive is highly relevant at sentencing.  *See Wisconsin v.*

*Mitchell,* 508 U.S. 476, 485 (1993); *United States v. Mahan,* 2007 WL 1430288, at 3 (10th Cir.

2007)  (sentence was procedurally unreasonable where district court refused to consider defendant's

stated motive for possessing unloaded shotgun, i.e., that he had been violently beaten by three men

and sought to defend his wife); *United States v. Milne,* 384 F. Supp. 2d 1309, 1310-1311 (E.D. Wis.

2005) (granting variance where "defendant did not take bank's money out of greed or desire to live

a lavish lifestyle, [but in an effort] to keep a sinking business afloat"); *United States v. Ranum,* 353

F. Supp. 2d 984, 990 (E.D. Wis. 2005) (Defendant did "not act for personal gain or for improper

personal gain of another").

        (1) *Nick did not wish to harm law enforcement*

The Court needs to consider the Assault/Battery in this cause was committed by

the discharge of the contents of a fire extinguisher at two locations towards law enforcement at a

distance of twenty (20) to thirty (30) feet.  The contents were dissipated quickly, non-toxic, and did

not cause damage nor injury.  This alone should weigh heavily on the Court as the Court looks to

Brockhoff's motive when determining if a departure sentence is warranted.

        *(1) The seriousness of the offense has been mitigated by the overall effect of Mr. Brockhoff's plea.*

Mr. Brockhoff did not go to jury trial; he entered a plea.  Mr. Brockhoff

has lost his livelihood, spent nearly two years without family, and will ultimately end up

a convicted felon as a result of the engagement in the behavior and plea.  Mr. Brockhoff

will never own a firearm, will have difficulty finding employment throughout his life,

and will not – for a period time – be able to vote.  Additionally, Nick's pretrial detention

conditions at the Northern Neck Regional Jail were deplorable.  Nick was often exposed

to filthy environments, constant lockdowns, several weeks at a time where Nick would

never see the sun or have fresh air, and countless occasions where Nick was exposed to

moldy food, and/or food which contained pests or was exposed to pests, including rats

and mice.  Due to the lack of reasonable and plentiful food, Nick lost nearly thirty pounds

in the initial stages of his confinement, and it wasn't until Nick was permitted to work in

the kitchen where he could sometimes eat leftover extra food that he was able to regain

any weight and health.  These conditions were so bad that the United States did not renew

the contract with the Northern Neck Regional Jail.  While an inmate, one would not

expect five-star accommodations, but one would expect a nation that fancies "human rights" could ensure minimum, but clean, and pest free, standards.

The road may not end here for Nick.  Attached is Exhibit "B, Declaration of Maureen Baird." Ms. Baird is a former employee of the Bureau of Prisons as a Warden.  She has articulated that should Nick receive additional incarceration, he would serve in a medium security federal prison, and may be subject to targeting (as has already occurred in pre-trial detention to some other January 6 defendants, and may in general be subject to general prison violence due to his slight stature, in-experience, and age.  While this offense is a felony,  Mr. Brockhoff had no ill motive or will, and the punishment has already been and will be severe.

*(3) Nicholas Brockhoff has been punished far beyond what is just.*

Nick has been detained throughout the duration of this matter.  The stigma of being a "Jan 6" defendant will follow him until his last days.  Courts can consider such things as loss of reputation.  In fact, This Court should consider Nicholas's loss of profession and reputation, *see, e.g., United States v. Gaind,* 829 F.Supp. 669, 671 (S.D.N.Y 1993) (granting downward departure where defendant was punished by the loss of his business); *United States v. Vigil,* 476 F. Supp. 2d 1231, 1235 (D.N.M 2007)  (finding variance appropriate where defendant was collaterally punished by loss of his position and reputation, widespread media coverage, and emotional toll of two lengthy public trials); *United States v. Samaras,* 390 F. Supp. 2d 805, 809 (E.D. WIS. 2005) (granting variance in part because defendant lost a good public sector job as a result of his conviction).

*(2) Mr. Brockhoff's behavior was aberrant*

 Mr. Brockhoff lived a law-abiding life.  He was very active with his family and friends.  He is also a dedicated family member and friend.  When viewed in the context of his productive young adult life, this offense is completely uncharacteristic of this body of work.  Nick went to the Capitol to view history and ruined his young life in twenty (20) or thirty (30) minutes.  This incident is

uncharacteristic of the life of a young man, who despite the small sample, had never had contact with law enforcement nor been inside of a courtroom.

Aberrant behavior under the USSG is behavior which was committed without significant planning, was of limited duration, and represents a marked deviation by Mr. Brockhoff of am otherwise law abiding life.  Additionally, this Court can depart under 5k2.20 as the incident did not involve serious bodily injury or death, the defendant did not discharge a firearm or otherwise used a firearm or dangerous weapon, the instant offense was not a serious drug trafficking offense, and Nick does not have any prior convictions or criminal history.  As for the fire extinguisher, and whether Nick used a dangerous weapon, the definition is as follows:

> (E) "***Dangerous weapon***" means (i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument (*e.g.* a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun).

The fire extinguisher does not fall under this definition, and therefore, Nick qualifies under 5.2K20.

This Court should grant a variance based on the aberrant nature of this felony conduct.  *See e.g., United States v. Howe,* 543 F.3d 128 (3rd Cir. 2008)(variance based on "isolated Mistake" in otherwise long and entirely upstanding life); *United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005)(defendant was a "law abiding citizen, who [did] an Incredibly dumb thing"); *United States v. Davis,* 2008 WL 2329290 (S.D.N.Y. June 5, 2008)(defendant was a first time offender who had worked throughout his 15 year marriage to educate his six children and whole offense was prompted by economic pressure); *United States v. Josie Clark,* 274 So.2d 1325 (11th Cir. 2001)(where court found an aberrant behavior reduction when defendant (1) Stopped the plans to commit the act on two occasions, but got sucked back in, (2) had no prior criminal history, (3) was threatened by another inmate if she did not commit act, her family would be harmed; despite fact

defendant pled guilty to Air piracy wherein the goal was to fly a helicopter to Stark, drop off guns and bolt cutters, and help death row inmates escape. Case was ultimately reversed due to fact a 240 month min man applied and court did not have authority to go below).

   **(b) to afford adequate deterrence to criminal conduct**

   Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006)"Three National Academy of Science panels… reached that conclusion, as has every major survey of evidence." *Id*.; *See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and Sentence Severity: An Analysis of Recent Research (1999),* summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF.  The report, commissioned by the British Home Office, examined penalties in the United States as well as several European Countries. *Id*. at 1.  It examined the effects of changes to both the certainty and severity of punishment.  *Id.*  While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates…were not sufficient to achieve statistical significance."  *Id*. at 2.  The report concluded that the "studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects."  *Id.* at 1.

   Research regarding white collar offender's in particular (presumably the most rationale of potential offenders) found no difference in the deterrent effect of probation and that of imprisonment. *See* David Weisburd *et al., Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes,* 33 Criminology 587 (1995); See also *Gabbay, supra,* at 448-449 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on white collar offenders.").  Statistics from the Sentencing Commission

restate the same.

**(c) to protect the public from further crimes of the defendant**

Mr. Brockhoff has a low risk of recidivism.  The Defendant is an excellent candidate for community supervision and will successfully complete all terms and conditions of any adjudged supervision.

For all male offenders accused of the type of crime alleged here, the recidivism rate is extraordinarily low.  For example, those in a Criminal History Category I, the recidivism rate is 11.7%.  For those who have been employed, the rate is 12.7%; and for those who were ever married, the rate is 9.8%.  For those with no history of illicit drug use, the recidivism rate is half those who have a drug history.  For those, like Nick, who are seeking higher education, have been employed, have strong family connections upon release, and are drug free, the recidivism rate is certainly much lower. Additionally, as Nick has remained incarcerated during this matter, a variance to time served followed by supervised release, puts Nick at an overall success rate (meaning no recidivism) of slightly less than eighty (80) percent while on supervised release.  This percentage of success only increases when Nick further receives higher level education, is with stable family, employed, and continues to remain drug free.

*See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* at Exh. 9, at 28; Exh. 10, at 29 (May 2004) [hereinafter *Measuring Recidivism*].  For all Category I defendants convicted of fraud, the recidivism rate is just 9.3%, the lowest of any offense category, which is 45% below the rate for all other offenders. Id. At Exh. 11, at 30.   *See* Sentencing Commission, *Recidivism and the 'First Offender,' at 13-14* (May 2004)[hereinafter *First Offender*].

The Commission has recognized the advisability of revising the guidelines to take age of the offender into account. *See Measuring Recidivism* at 16 (noting that "[o]ffender age is a pertinent

characteristic" that would "improve [the] predictive power of the guidelines "if incorporated into

the criminal history guidelines but has recently stated that age "may be relevant" in granting a

departure. USSG 5H1.1).  Note, and recall, the Defendant is 40 years of age.

In imposing the least sufficient to account for the need to protect the public from further

crimes of Mr. Brockhoff, this Court should consider the statistically low risk of recidivism

presented by Mr. Brockhoff's history and characteristics, and specifically his strong family ties. *See*

*e.g., United States v. Urbina,* slip op., 2009 WL 565485, *3 (E.D. Wis. Mar. 5, 2009)(considering

low risk of recidivism indicated by Defendant's lack of criminal history, positive work history, and

strong family ties); *United States v. Hamilton,* 323 Fed. Appx. 27, 31 (2d Cir. 2009)("the district

court abused its discretion in not taking into account policy considerations with regard to age

recidivism not included in the Guidelines"); *United States v. Holt, 486 F.3d 997, 1004 (7th Cir.*

*2007)(*affirming below guidelines sentence based on defendant's age, which made it unlikely that he

would be again involved in a violent crime); *United States v. Cabrera,* 567 F. Supp. 271, 279 (D.

Mass. 2008)(granting variance because defendant's "with zero criminal history points are less likely

to recidivate than all other offenders"); *Simon v. United States,* 361 F. Supp. 2d 35, 48 (E.D.N.Y.

2005)(basing variance in part on Defendant's age of 50 upon release because recidivism drops

substantially with age); *United States v. Nellum,* 2005 WL 300073 at *3 (N.D. Ind. Feb. 3,

2005(granting variance to 57 year old defendant because recidivism drops with age); *United States*

*v. Ward,* 814 F. Supp. 23, 24 (E.D. Va. 1993)(granting departure based on defendant's age as first

time offender since guidelines do not "account for the length of time a particular defendant refrains

from criminal conduct "before committing his first offense).

**3.      The Kinds of Sentences Available**

In <u>Booker</u>, the Supreme Court severed and excised 18 U.S.C. 3553(b), the portion of the

federal sentencing statute that made it mandatory for courts to sentence within a particular

sentencing guidelines range. <u>Booker</u>, 125 S. Ct. at 756.  This renders the sentencing guidelines advisory. <u>Id.</u>  [Cite to 18 U.S.C. 3551, 3559, 3561, 3571, 3581 for the types of available sentences based upon defendant's conviction.]

Congress has directed the commission to "ensure that guidelines reflect the General appropriateness of imposing a sentence other than imprisonment in cases In which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense," and the "general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury." 28 U.S.C. 994(j). Congress issued this directive in the belief that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of non-violent and non-serious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service." *See* Pub. L. No. 98-473, 239, 98 Stat. 1987, 2039 (1984)(set forth at 18 U.S.C. 3551 note).   Nicholas Brockhoff is clearly not a "violent and serious offender" who "pose[s] the most dangerous threat to society."

**4.      The Sentencing Range Established by the Sentencing Commission**

Mr. Brockhoff, in accord to the PSI, is a level 23, category criminal history I.  This gives Mr. Brockhoff a guidelines range of 46-57 months, followed by supervised release.  The undersigned and Defendant seek a more reasonable incarcerative sentence to time served followed by a term of supervised release.

**5.      The Need to Avoid Unwarranted Disparities**

The Court must consider the need to avoid unwarranted disparities among defendants with similar criminal histories convicted of similar criminal conduct.  18 U.S.C 3553(a)(6).  The court

should avoid unwarranted similarities in sentencing among defendants who are different in ways not accounted for in the guideline range, *See Gall v. United States,* 552 U.S. 38, 55 (2007)("need to avoid unwanted *similarities* among other co-conspirators who were not similarly situated"); *United States v. Ovid,* 2010 WL 3940724 (E.D.N.Y 2010)(sentencing two defendants with similar guideline ranges to 60 months and 126 months respectively based on distinctions in circumstances of the offenses and characteristics of the defendants), and unwarranted differences among defendants whose conduct and characteristics are similar. *See United States v. Parris,* 573 F. Supp. 2d 744, 753, 756-62 (E.D.N.Y. 2008).

In fiscal year 2011, sentences below the guideline range were imposed in 43.1% of all fraud cases; 20.5% were government sponsored, 22.6% were non-Government sponsored.  *See* U.S. Sentencing Commission, *2011 Sourcebook of Federal Sentencing Statistics,* tbl. 27. In *United States v. Parris,* 573 F. Supp. 2d 744 (E.D.N.Y. 2008), Judge Block in the Eastern District of New York took a similar collection of cases into account in fashioning an appropriate sentence for two securities fraud offenders.   At the Court's request, each party submitted a sample group of cases to illustrate the sentences imposed in other securities fraud cases.  Id. At 752.  Based on these samples, the court concluded that "[t]hose [defendants] who were not cooperators and were responsible for enormous loses were sentenced to double-digit terms of imprisonment (in years); [while] those whose losses were less than $100 million were generally sentenced to single digit terms." Id. At 753.   The Court relied on this national pattern in arriving at a sentence of 60 months for the two defendants who faced an advisory guideline range of 360 months to life, which was 16.7% of the bottom of the applicable guideline range.

 The Court should impose time served and move Mr. Brockhoff immediately to supervised release in this case.

(a)  Parity in Sentencing

The undersigned informs the Court of the following dispositions of matters of Defendants similarly situated based on charges):

| Name | Case number | Statute | Govt Rec. | Received |
|---|---|---|---|---|
| Scott Fairlamb | 21CR120 | 18USC111(a)(1) 18USC1512(c)(2) | 44 mths f/b 36 mths | 41 mths f/b 36 mths |
| Robert Palmer | 21CR328 | 18USC11(a), (b) | 63 mths f/b 36 mths | 63 mths f/b 36 mths |
| Devlyn Thompson | 21CR461 | 18USC111(a)(, (b) | 48 mths f/b 36 mths | 46 mths f/b 36 mths |
| Nicholas Languard | 21CR353 | 18USC111(a), (b) | 51 ths f/b 36 mths | 44 mths f/b 36 mths |
| Mark Leffingwell | 21CR5 | 18 USC111(a)(1) | 27 mths f/b 36 mths | 6 mths f/b 24 mths |
| Duke Wilson | 21CR345 | 18USC111(a)(1) 18USC1512(c)(2) | 46 mths f/b TBD | 51 mths f/b 36 mths (inj. LEO) |
| Kevin Creek | 21CR645 | 18USC111(a)(1) | 27 mths f/b 36 mths | 27 mths f/b 12 mths |
| Matthew Miller | 21CR75 | 18USC111(a)(1) 18USC1512(c)(2) | 51 mths f/b 36 mths | 33 mths f/b 24 mths |
| Gregory Rubenacker | 21CR193 | 18USC231(a)(3) 18USC1512(c)(2) 18USC111(a)(1) 18USC1752(a)(1), (a)(2), (a)(4) 40USC5104(e)(2)(D), (e)(2)(E), (e)(2)(G) | 46 mths f/b 36 mths | 41 mths f/b 36 mths |
| Cody Matice | 21CR657 | 18USC111(a)(1) | 44 mths f/b 36 mths | 44 mths f/b 36 mths |
| James Mault | 21CR657 | 18USC111(a)(1) | 44 mths f/b 36 mths | 44 mths f/b 36 mths |
| Mark Ponder | 21CR259 | 18USC111(a)(1, (b) | 60 mths f/b 36 mths | 63 mths f/b 36 ,ths |
| Ricky Wilden | 21CR423 | 18USC111(a)(1) | 30 mths f/b 36 mths | 24 mths f/b 36 mths |
| Richard Howard | 21CR721 | 18USC111(a)(1) | 46 mths f/b 36 mths | 46 mths f/b 36 mths |
| Marshall Neefe | 21CR567 | 18USC111(a)(1) 18USC1512(c)(2) | 46 mths f/b 36 mths | 41 mths f/b 36 mths |
| Lucas Denney | 21CR70 | 18USC111(b) | middle USSG f/b 36 mths | 52 mths f/b 36mths |
| Alan Byerly | 21CR527 | 18USC111(a)(1) 18USC113(a)(4) | 46 mths f/b 36 mths | 34 mths f/b 36 mths |
| Mark Mazza | 21CR736 | 18USC111(a)(1), (b) | 78 mths f/b 36 mths | 60 mths f/b 36 mths (had 2 F/A) |
| Alberquerque Head | 21CR291 | 18USC111(a)(1) | 96 mths f/b 36 mths | 90 mths f/b 36 mths (pulled LEO into crowd) |
| Ronald Sandlin | 21CR88 | 18USC1512(k) 18USC111(a)(1) 18USC111(a)(2) | 63 mths f/b 36 mths | 63 mths f/b 36 mths |
| Troy Sargent | 21CR258 | 18USC231(a)(3) 18USC111(a)(1) 18USC1752(a)(1) 18USC1752(a)(2) | 27 mths f/b 36 mths | 14 mths f/b 36 mths |
| Matthew Counsel | 21CR207 | 18 U.S.C. § 231(a)(3) 18 U.S.C. § 111(a)(1) 18 U.S.C. § 1752(a)(1) 18 U.S.C. § 1752(a)(2) 40 U.S.C. § 5104(e)(2)(D) 40 U.S.C. § 5104(e)(2)(G) | 30 mths f/b 36 mths | 60 mths probation 6 mths home confinement |
| Douglas Jensen | 21CR6 | 18 U.S.C. § 231(a)(3) 18 U.S.C. § 1512(c)(2) 18 U.S.C. § 111(a)(1) 18 U.S.C. § 1752(a)(1) and (b)(1)(A) 18 U.S.C. § 1752(a)(2) and (b)(1)(A) 40 U.S.C. § 5104(e)(2)(D) 40 U.S.C. § 5104(e)(2)(G) | 64 mths f/b 36 mths | 64mths f/b 36 mths |
| James McGrew | 21CR398 | 18USC111(a)(1) | 78 mths f/b 36 mths | 78 mths f/b 36 mths |
| Phillip Young | 21CR617 | 18USC111(a)(1) 18USC231(a)(3) | 40 mths f/b 36 mths | 8 mths f/b 36 mths |
| Julian Khater | 21CR222 | 18USC(a)(1), (b) | 90 mths f/b 36 mtgs | 80 mths f/b 36 mths |
| Joshua Hernandez | 21CR42 | 18USC231(a)(3) 18USC111(a)(1) | 30 mths f/b 36 mths | 24 mths f/b 36 mths |
| Justin Jersey | 21CR35 | 18USC111(b) | 63 mths f/b 36 mths | 51 mnths f/b 36 mths |
| Michael Dickinson | 21CR111(a)(1) | 18USC(a)(1) | 27 mths f/b 36 mths | 20 mths f/b 36 mths |
| Garrett Miller | 21CR119 | 18USC231(a)(3) 18USC111(a)(1) 18USC875(c) 18USC1752(a)(1) 18USC1752(a)(2) 18USC1752(a)(3) 40USC5104(e)(2)(D) 40USC5104(e)(2)(E) 40USC5104(e)(2)(G) 18USC231(a)(3) | 48 mths f/b 36 mths | 38 mths f/b 36 mths |

| | | | | |
|---|---|---|---|---|
| David Mehaffie | 21CR40 | 18USC111((a)(1), (2) 18USC231(a)(3) 40USC5104(e)(2)(D) 40USC(e)(2)(F) | 64 mths f/b 36 mnths | 14 mths f/b 36 mths |
| David Judd | 21CR40 | 18USC111(a)(1), (b) 18USC1512(c)(2) | 90 mths f/b 36 mths | 32 mths f/b 24 mths |
| Michael Eckerman | 21CR623 | 18USC111(a)(1) | 24 mths f/b 36 mths | 20 mths f/b 36 mths |
| Daniel Egtvedt | 21CR177 | 18USC(A)(1) 18USC231(a)(3) 18USC1512(c)(2) 18USC1752(a)(1) 40USC5104(e)(2)(D) | 64 mnths f/b 36 | 42 mths f/b 36 mths |
| Mitchell Gardner | 21CR622 | 18USC231(a)(3) 18USC1512(c)(2) 18USC111(a)(1) and (b) | 71 mths f/b 36 mths | 55 mths f/b 36 mths |
| Aiden Bilyard | 22-CR-34 | 18USC111(a)(1) and (b) | 47 mths f/b 36 mths | 40 mths f/b 36 mths |
| David Judd | 21CR40 | 18USC111(a)(1) 18USC1512(c)(2) | 90 mths f/b 36 mths | 32 mths f/b 36 mths |
| Steven Tristan | 21CR40 | 18USC111(a)(1) 18USC111(a)(2) 18USC231(a)(3) 40USC5104(e)(2)(F) | 78 mths f/b 36 mths | 60 mths f/b 24 mths |
| Geoffrey Sills | 21CR40 | 18USC2111 and 2112 18USC111(a)(1) and (b) 18USC1512(c)(2) | 108 mths f/b 36 | 52 mths f/b 36 mths |
| William Riley | 21-CR-618 | 18USC231(a)(3) 18USC111(a)(1) 18USC1752(a)(1) 18USC1752(a)(2) 40USC5104(e)(2)(G) | 87 mths f/b 36 | 36 mths f/b mths |
| Josiah Kenyon | 21-CR-726 | 18USC111(a)(1) | 88 mths f/b 36 | 72 mths f/b 36 mths |
| Robert Sanford | 21-CR-86 | 18USC111(a)(1) and | 71 mths f/b 36 mths | 52 mths f/b 36 mths |
| Logan Barnhart | 21-CR-35 | 18USC111(a)(1) and (b)and (2) | 63 mths f/b 36 mths | 36 mths f/b 36 mths |
| Robert Dennis | 21-CR-679 | 18USC(a)(1) 18USC231(a)(3) 18USC1752(a)(1) 18USC1752(a)(2) 18USC1752(a)(4) 18USC5104(e)(2)(F) | 64 mths f/b 36 mths | 36 mths f/b 36 mths |
| Vincent Gillespie | 21-CR-60 | 18USC111(a)(1) 18USC231(a)(3) 18USC1752(a)(4) | 87 mths f/b 36 mths | 68 mths f/b 36 mths |

Parity in sentencing shows a range of 14 months to 90 months on the top, all followed by

Terms of supervised release.  One thing is clear, though, of the 45 listed defendants [whom have

been sentenced and from the list above] 31 of those defendants received variances or sentences

below the Government's recommendation.  In order for Brockhoff to have parity with the other

similarly situated Defendant's, Brockhoff should receive a variance to time served followed by 36

months supervised release.  Additionally,  and as noted above, Undersigned Counsel recognizes that

in light of the sheer number of January 6 defendants, it is likely important to the Court to attempt to

achieve some degree of uniformity in the various sentences imposed. As such, Undersigned

Counsel has identified (thru February 2023) forty-one cases in which defendants have been sentenced to 30 months or more imprisonment among the 394 January 6 defendants sentenced so far and has reviewed the facts set forth in the government sentencing memorandums filed in each of the forty-one cases.[1]

> *United States v. Webster*, No. 1:21-CR-00208-APM
>
> 120 months incarceration
>
> Convicted after a trial.
>
> Former Marine and a 22-year veteran of the New York City Police
>
> Department
>
> Traveled to D.C. with an NYPD bulletproof vest and a Smith and Wesson Model 640
>
> revolver, small enough to conceal inside a jacket pocket.
>
> Carried a large metal flagpole.
>
> After attempting to provoke an officer standing behind a bike-rack

---

[1]This analysis is based upon the Sentencing Chart filed in *United States v. Horning*, No. 1:21-CR-00275-ABJ on February 7, 2023. Additionally, this summary quotes the work of Clint Broden, Esquire.

barricade into a fight, he forcefully pushed against the bike rack. The officer
reached across to shove him away but in doing so, struck Webster on his face.
Webster then swung the flagpole against the bike rack with enough force to break
the metal pole in half. He charged at the officer and tackled the officer to the ground
after the officer wrestled the flagpole out of his grip. He then dragged the officer by
his helmet, pinned him to the ground, and tried to rip his gas mask off.  This caused
tear gas to become trapped inside the officer's mask, and his throat and nose began
to burn.  While he restrained the officer on the ground, other rioters began kicking
the officer. He left the officer on the ground and continued toward the Capitol.

*United States v. Head*, No. 1:21-CR-00291-ABJ

90 months incarceration

Carried knife on hip.

Repeatedly struck towards police line with a riot shield.

Pushed the shield against an officer for nearly three minutes. After a continued struggle with
the officer, he wrapped his arm around the officer's neck and yelled, "I've got one!" He
then dragged the officer into the mob, isolating him as the crowd violently assaulted the
officer.

*United States v. Robertson*, No. 1:21-CR-00034-CRC

87 months incarceration

Police sergeant with the Rocky Mount, Virginia, police department and army veteran.

Brought a gas mask and large wooden stick.

Raised up his wooden stick in "port arms," a tactical position used by the military and law
enforcement to push others away, and blocked the path of officers attempting to hold back
the mob.

Destroyed evidence from him and a co-defendant prior to arrest.

*United States v. Young*, No. 1:21-CR-00291-ABJ

86 months incarceration

Brought 16-year-old son with him.

Stormed the police line in the tunnel on the Lower West Terrace.

Handed fellow rioter a taser.

Held a strobe light toward officers fighting in an effort to impair their vision and distract them.

Worked with another rioter to throw a large audio speaker toward the police line, which missed the officers and struck a fellow rioter on the head, drawing blood.

Used a long pole or stick to jab towards the police line.

Joined an attack on an officer by restraining his wrist while a co-defendant removed his police badge and police radio. The officer's wrist was broken by a riot shield moving through the crowd above the rioters' heads.

Assaulted an officer who was temporarily disoriented and blinded by bear spray by grabbing at his helmet and body, pushing him, and hitting him.

*United States v. Khater*, No. 1:21-CR-00222-TFH

80 months incarceration

Arrived to D.C. with two containers of bear spray and two containers of hand-held pepper spray.

Pepper sprayed any police officer he could find for nearly half a minute. He sprayed at least three officers at close range on the Lower West Terrace.

By his own admission, he climbed up the scaffolding in order to take a picture.

*United States v. McGrew*, No. 1:21-CR-00398-BAH

78 months incarceration

Former U.S. Marine.

Flew with bear mace to D.C.

Entered the Capitol through the unguarded Upper West Terrace doorway. Prior to entering, he encouraged other rioters, repeatedly yelling, "Let's Go!"

Struck an MPD officer within seconds of entering the Capitol.

Screamed at officers and refused to follow instructions to leave the building.

Struck several more officers, attempted to and successfully grabbed officer's batons, and locked arms with other rioters, in defiance of officer's commands that rioters leave the building.

After being pushed out of the Rotunda, he traveled to the Lower West Terrace. There, as he had at the West Plaza, he pushed his way through throngs of people until he was face-to-face with officers. He then participated in an unsuccessful push into a tunnel entrance to the Capitol and taunted officers, before grabbing a wooden handrail with a metal hook on the end and launched it into the tunnel. Afterwards, he and other rioters began pushing into the tunnel again and pushing the officers within the tunnel back.

*United States v. Caldwell, Daniel*, No. 1:21-CR-00181-CKK

68 months incarceration

Marine veteran.

Armed himself with bear spray, outfitted himself with glasses that

could protect himself from some of the effects of pepper spray, and brought a

hand held two-way radio.

Sprayed a line of officers protecting the Lower West Terrace Place with a canister of gaseous

chemical irritant.

Confronted and taunted police officers by asking them to spray, and asking if they were

"scared."

Present on the front lines of the main assault for almost the duration of the confrontation.

*United States v. Palmer*, No. 1:21-CR-0328-TSC

months incarceration

Was on the steps leading to the LWT tunnel and, having acquired a wooden plank, he threw

the plank like a spear at police officers.

He picked up a fire extinguisher and sprayed police with its contents. Then, once it was empty,

he threw it at police officers.

He then "cast around for additional items with which he could assault the police." He took

hold of a long piece of scaffolding wrapped in canvas and pushed it at the legs of the police.

He then picked up the fire extinguisher he previously used to assault police and again threw

it at police.

Also, at some point, he picked up an orange traffic barrier and threw it towards the police.

*United States v. Ponder*, No. 1:21-CR-00259-TSC

63 months incarceration

Convicted after a trial.

Recruited co-defendants.

Swung a pole at an officer and after his pole broke against the officer's shield, he re-armed himself with a sturdier pole and assaulted another officer.

15 minutes after the first two assaults, he assaulted another officer with the same sturdier pole.

*United States v. Sandlin*, No. 1:21-CR-00088-DLF

63 months incarceration

Traveled to D.C. along with two co-conspirators in a car full of weapons, including several knives, bear spray, Glock 43 pistol, two magazines of ammunition, gas masks, stun gun, slingshot, military-style vests/body armor, two helmets, a baton, walkie-talkies and Sandlin's M&P pocket pistol.

Made his way through the East Rotunda doors with his co-conspirators and shoved officers to force the door behind them open, allowing the mob outside to begin streaming in.

Attempted to rip the helmet off an officer.

Along with his co-conspirators, he engaged in a shoving match with officers in an attempt to keep the doors to the Senate Gallery open, striking an officer's head in the process.

Wandered through the Capitol in pursuit of members of Congress, asking an unknown individual, "is that where the Senators are at?"

Smoked a marijuana joint in the Rotunda of the Capitol while stating, "we made history" and "this is our house."

*United States v. Jensen*, No.1:21-CR-00006-TJK

60 months incarceration

Convicted after a trial.

Ringleader during the attack on the U.S. Capitol, working to rile up the crowd and encourage others to follow him into and through the building.

Scaled a twenty-plus-foot wall to be one of the first rioters to break into the building and disrupt the proceedings in Congress.

Tenth rioter to enter the Capitol.

Led a group of armed rioters in pursuit of an officer up a staircase, steps away from the Senate Chamber, where members of Congress were sheltering at the very moment.

*United States v. Mazza*, No. 1:21-CR-00736-JEB

60 months incarceration

Traveled to D.C. with two loaded handguns: a Smith and Wesson, .40 caliber semi-automatic handgun, and a .45 caliber/.410 caliber revolver ("Taurus Judge").

Dropped or lost the Taurus Judge revolver on the steps leading up to the West Front Terrace.

After entering the Capitol, he joined mob of other rioters who were trying to break through the police line to gain entry into the lower level of the Capitol.

Armed himself with a stolen police baton and used it to assault police officers.

Remained on Capitol grounds for a number of hours still armed with the loaded .40 caliber semi-automatic firearm.

Filed false police report about how he had lost the Taurus Judge and provided false information to Capitol Police.

*United States v. Williams*, No. 1:21-CR-00377-BAH

60 months incarceration

Convicted after a trial.

Helped rioters climb bicycle racks so that he and the other rioters to overrun the police on the Northwest stairs.

Stole water bottles that Capitol police officers had stored to be used for decontamination if they were hit with chemical irritants.

Entered the Capitol through the Senate door with the first large wave of rioters to breach the Capitol.

Celebrated and smoked marijuana with other rioters in the Rotunda.


*United States v. Pruitt*, No. 1:21-CR-00023-TJK

55 months incarceration

Proud Boys member

Wore a tactical glove with knuckle pads and a cut-off t-shirt with the logo of the "Punisher" –an anti-hero known for dispensing violent vigilante justice.

Was wearing an electronic ankle monitor for being arrested recently.

Climbed a bike rack as a ladder to be at the front of the mob that breached the building.

Tossed a chair in the direction of officers in the Visitor Center.

Came face to face with then-Senate Minority Leader Chuck Schumer, who was trying to evacuate

*United States v. Denney*, No. 1:22-CR-00070-RDM

52 months incarceration

Former military police officer.

Used Facebook to recruit for his militia group called the Patriot Boys of North Texas and fundraised for weapons, gear, lodging, and travel.

Arrived eager for violence in full battle attire wearing a helmet, knuckled gloves, and a ballistic vest with body armor under his jacket.

Deployed pepper spray at the line of Capitol police officers.

Grabbed and shoved a police officer.

Threw a pepper spray cannister in the direction of the line of officers.

Assaulted officers with a pole and attempted to disarm them.

Along with another rioter, he launched a large tube at the line of police officers guarding the west side of the Capitol building.

Swung his arm and fist at an officer in an attempt at pulling him down the stairs.

Lied to FBI agents about his knowledge of the assault.

*United States  v. Wilson*, No. 1:21-CR-00345-RCL

51 months imprisonment

Physically engaged with officers by punching, shoving and kicking them, as well as attempting to steal their riot shields.

Picked up a several feet long white cylindrical object, believed to be a thin polyvinyl chloride (PVC) pipe, and indiscriminately struck at officers with it.

"[E]ngaged multiple officers with whatever means he had available."

*United States v. Bledsoe*, No. 1:21-CR-00204-BAH 48 months incarceration

Convicted after a trial. Moreover his PSR recommended a sentencing enhancement based on his false testimony at trial.

Scaled a wall to access the upper northwest terrace.

Climbed statue of President Gerald Ford and planted a Trump flag on his arm.

Remained inside the Capitol for 22 minutes and wandered through the Statuary Hall before joining another crowd of rioters circling the House Chamber while members of Congress were trapped inside and unable to evacuate.


*United States v. Decarlo*, No. 1:21-CR-00073-BAH

48 months incarceration

Significant ties to Proud Boys

Threw smoke bomb at police.

Rummaged through a Capitol police duffle bag and stole a pair of flex cuffs.

Scrawled "Murder the Media" on one of the Capitol's doors.

*United States v. Hale-Cusanelli*, No. 1:21-CR-00037-TNM

48 months incarceration

Convicted after a trial sporting a "Hitler mustache."

Former Army reservist and security contractor who held a "Secret" level security clearance when he and others sieged the Capitol.

At front of a mob that attacked police and smashed windows and doors to breach the Capitol.

Unsuccessfully intervened in an arrest of a rioter by trying to pull the

rioter away from the officer.

*United States v. Herrera*, No. 1:21-CR-619-BAH

48 months incarceration

Convicted after a trial.

Came prepared wearing a gas mask, goggles, and a bulletproof vest.

Climbed scaffolding and entered the Capitol through a fire door, located near the Senate Parliamentarian's Office on the Senate wing side of the building.

Posted an Instagram photo of himself picking up a stack of papers and throwing them in the air. Later, in an exchange with someone else on Instagram, he said he had picked up the papers and had someone photograph him because he wanted a "fuck you" picture.

Stole a bottle of liquor, which he drank and raised triumphantly as he exited the Capitol the first time.

Reentered the Capitol through the nearby Senate Wing Doors. As he entered, he walked past shattered windows on each side of the door and spent a few minutes setting up his camera and taking photographs.

Then he proceeded to a nearby "hideaway" office of a U.S. Senator, where he smoked a marijuana cigarette that was passed around by other rioters.

After, he proceeded to the Crypt, and remained inside for 15 minutes while he took more photographs, before exiting the building.

*United States v. Ochs*, No. 1:21-CR-00073-BAH

48 months incarceration

Proud Boys member.

Walked around and filmed the attack on the U.S. Capitol

Threw smoke bomb at police.

Smoked cigarettes in Rotunda.

Pointed rioters toward the Speaker's Office.

Posed in front of "Murder the Media" graffiti his co-defendant had scrawled on one of the Capitol's doors.

*United States v. Coffman*, No. 1:21-CR-00004-CKK

46 months imprisonment

Drove to Washington on January 6 from Alabama in a pickup truck containing loaded firearms, including a 9mm handgun, a rifle, and a shotgun. Also, inside the pickup truck and in its covered bed were hundreds of rounds of ammunition, large-capacity ammunition feeding devices, a crossbow with bolts, machetes, camouflage smoke devices, a stun gun, cloth rags, lighters, a cooler containing eleven mason jars with holes punched in the lids, and other items. The eleven mason jars each contained a mixture of gasoline and Styrofoam. The mason jars and their contents, along with the lighters and cloth rags, made up the component parts of bottle-based improvised incendiary weapons (*i.e.* Molotov cocktails).
The Styrofoam in the Molotov cocktails was designed to have a napalm effect of adhering to the skin of its victims.
A month before January 6, he had traveled to Washington and attempted to drive to the residence of a United States Senator.

*United States v. Hughes*, No. 1:21-CR-000106-TJK

46 months incarceration

Climbed scaffolding.

Among first rioters to reach the Upper West Terrace.

Eighth rioter to enter the Senate Wing Door building through smashed window.

Kicked the Senate Wing Door open from inside with another rioter.

Chased a Capitol Police officer and yelled violent and angry threats.

Occupied the Senate chamber and reviewed sensitive documents that had been left behind by Senators forced to flee for their lives.


*United States v. Richardson*, No. 1:21-CR-00721-CKK 46 months incarceration

Struck a police officer three times with a metal flagpole, stopping only when the pole broke in his hands.

Retreated after he was pepper sprayed.  Two minutes later, he and other rioters grabbed and shoved a large metal billboard toward the police, using it as a battering ram.

*United States v. Thompson*, No. 1:21-CR-00461-RCL 46 months incarceration

Joined rioters as they actively assaulted police.

Armed himself with a police baton and incited violence outside of the Capitol.  Also stayed in the heart of the violent zone, watching *hours* of attacks against law enforcement. Indeed for nearly two hours he stood "in the vicinity of some of the most violent conduct on January 6, observing, commenting and occasionally chanting while windows were smashed, and the police line was repeatedly attacked."

Provided rioters with riot shields to use against the police which had previously been stolen from the police.

Assisted in throwing a large audio speaker at police.

Assaulted a police officer with a baton when the officer was trying to assist a rioter needing medical attention.


United States v. Languerand, No. 1:21-CR-00353-JDB

44 months incarceration

Threw a piece of wood at police.

Just a few minutes later, he and another rioter threw a heavy black audio speaker at the police.

A minute later, threw two sticks in rapid succession at officers.

Three minutes later, threw another stick at officers.

A few seconds later, threw a large orange traffic bollard which ricocheted off the riot shield of an officer before colliding with multiple officers inside the archway.

A minute later, threw a pepper spray container followed by a bottle of liquid.

Approximately 30 seconds later, threw a piece of wood,

Then threw another stick at the police.

*United States v. Mattice*, No. 1:21-CR-00657-BAH

44 months incarceration

Anticipated and planned for violence in pre-riot text message conversations with co-defendant Mault.

Recorded a video conveying his intent and foreshadowing his violent conduct. He explained, "We're all getting ready to go march on Capitol Hill. We're gonna fuck some shit up. It's about to be nuts."

Along with co-defendant Mault, and other rioters, they pushed against the line of police, broke the line, and forced the police barriers apart, overwhelming and surrounding the police.

Texted family to brag about breaking police line.

Body-surfed over members of the crowd and hung from the wooden frame beneath the arch.

Used chemical spray against police officers.

Lied to FBI agents claiming that he did not fight with police but, instead simply absorbed their blows without fighting back.


*United States  v. Mault*, No.1:21-CR-00657-BAH

44 months incarceration

Anticipated and planned for violence in pre-riot text message conversations with co-defendant Mattice.

Along with co-defendant Mattice, and other rioters, they pushed against the line of police, broke the line, and forced the police barriers apart, overwhelming and surrounding the police.

Body-surfed over members of the crowd and hung from the wooden frame beneath the arch.

Assaulted police officers. Obtained a canister from another rioter and deployed its dangerous contents at police officers.


*United States v. Secor*, No. 1:21-CR-00157-TNM

42 months incarceration

Scaled scaffolding.

Walked through the office suite of Nancy Pelosi.

Assisted a group of rioters to push open the East Rotunda doors and helped

other rioters enter the building.

Sat in the seat that Vice President Mike Pence occupied 30 minutes earlier.


*United States v. Chansley*, No. 1:21-CR-0003-RCL

41 months incarceration

Q-Anon Shaman and the very face of the events of January 6.

Climbed the scaffolding.

Entered the Capitol and roamed the second and third floors of the building.

Entered the Senate gallery and screamed obscenities.

Scaled the Senate dias "taking the seat that Vice President Mike Pence had occupied less than

an hour before" and took pictures of himself on the dias.

Called other rioters up to the dias and lead them in an incantation including to be thankful

for the "opportunity 'to allow us to send a message to all the tyrants, the communists, and

the globalists, that this is our nation, not theirs, that we will not allow American, the

American way of the United States of America to go down.'"

Gave a 60 Minutes interview falsely claiming that he was let into the Capitol by law

enforcement and was merely intending to bring divinity, to bring God back into the Senate.


*United States v. Fairlamb*, No. 1:21-CR-00120-RCL

41 months incarceration

shoved and Punched an MPD officer.

Climbed the scaffolding.

Entered the Capitol carrying a stolen police baton.


*United States v. Neefe*, No. 1:21-CR-00567-RCL

41 months incarceration

Fabricated a wooden club and carried it on to the Capitol grounds.

Assisted a group of rioters in hoisting and thrusting a large metal sign frame into a line of officers.  The sign could have "split someone's head open."


*United States v. Rubenacker*, No. 1:21-CR-00193-BAH

41 months incarceration

One of the first 50 rioters to enter the Capitol.

Was at the front of the mob, along with other rioters, and chased a Capitol police officer up a flight of stairs, directly past where lawmakers had just retreated from conducting the joint session, yelling "Where are they counting the votes?" and "He's one person, we're thousands!"

Exited the east side of the Capitol and reentered later through the East Rotunda doors as part of a mob of rioters, during which rioters surrounded and assaulted law enforcement officers attempting to prohibit entry to the East Rotunda doors.

Smoked marijuana in the Rotunda.

Swung a water bottle at an officer's head and threw liquid at other officers.


*United States v. Smith*, No. 1:21-CR-00567-RCL

41 months incarceration

Assisted a group of rioters in hoisting and thrusting a large metal sign

frame into a line of officers.  The sign could have "split someone's head open."

Encouraged rioters to keep forcing a door closed so that officers could not

exit and defend the Capitol.


*United States v. Hughes*, No. 1:21-CR-00106-CKK

38 months incarceration

Climbed scaffolding.

At the front of the mob that forced bike rack barriers down and breached the police line.

Among first rioters to reach the Upper West Terrace.

Ninth rioter to enter the Senate Wing Door building through smashed window.

Chased a Capitol Police officer and yelled violent and angry threats.


*United States v. Reid*, No. 1:21-CR-00316-DLF

37 months incarceration

Was in the front among the first to rush up the steps when rioters broke through a police line

under the scaffolding.

For over an hour, he walked through the Capitol, surged through police lines, led rioters through

the building, and encouraged other rioters to enter.

Made his way to the Speaker's Lobby and damaged a television and water cooler in the nearby

bathroom.

*United States v. Tenney*, No. 1:21-CR-00640-TFH

36 months incarceration

He and a co-defendant entered the Capitol through the West  Terrace.

He then walked through the rotunda and it was he who personally forced open the Rotunda Doors on the east side which ultimately allowed rioters to enter from that side of the building.

He grabbed the Sergeant at Arms from behind and pushed him into a doorframe. He also locked arms with a U.S. Capitol Police Officer B.A. and shoved another U.S. Capitol Police officer.


*United States v. Thompson*, No. 1:21-CR-00161-RBW

36 months incarceration

Convicted after a trial.

Came prepared wearing a bulletproof vest.

Walked into and looted Senate Parliamentarian's office, stealing two bottles of liquor.

Then went outside to find and encouraged co-defendant Lyon to participate in the riot.

He stole a coat rack, and announcer pager used by U.S. Capitol Police to send emergency alerts throughout the building.

Picked up someone's cell phone off a staffer's desk.


*United States v. Byerly*, No. 1:21-CR-00527-RDM

34 months incarceration

Purchased a stun gun and traveled with it to D.C.

Engaged in three separate assaults. Two against police and one against a news reporter.

Assisted a group of rioters in using a large steel frame Trump sign as a battering ram against police officers.

Participated in vicious assault against a news reporter, by grabbing the victim with both hands near the shoulder and upper chest and pushing him backward. He pushed and dragged the victim toward a dense crowd. He then placed both of his hands in the area of the victim's face and neck and continued to shove and push the victim away from the stairs, and toward a low stone wall.

Used his stun gun against Capitol police and MPD officers.

After having had the stun gun removed from his hands, he continued to charge toward and physically strike officers.

Grabbed and wrestled an officer for his baton.

*United States v. Miller*, No. 1:21-CR-00075-RDM

33 months incarceration

While on restricted ground of the Capitol, draped in a Confederate flag, threw a full beer can at law enforcement.

Used a bike rack to scale the Capitol wall.

Threw batteries at officers.

Sprayed officers located in the Lower West Terrace tunnel with the contents of a fire extinguisher as other rioters assaulted officers with bats, flag poles and riot shields. The contents of the fire extinguisher sprayed at least a dozen police officers.

These summaries of those cases simply point out the obvious.  Brockhoff was not violent like them and Brockhoff's current time served request is a sentence sufficient to meet both parties desires as well as to satisfy 18 USC 3553.

**6.      The need to provide restitution to any victims of the offense**

In determining the appropriate sentence, this Court must consider "the need to

provide restitution to any victims of the offense," *See* 18 U.S.C. 3553(a)(7); *see also e.g.,*

*United States v. Merryweather,* 447 F.3d 625, 634 (9th Cir. 2006) (acknowledging the

district court's discretion to depart from the guidelines to impose a probationary sentence,

since the "goal of obtaining restitution for the victims of the Defendant's offense…is

better served by a non-incarcerated and employed defendant); *United States v. Peterson,*

363 F. Supp. 2d 1060, 1061-62 (E.D. Wis. 2005)(granting a variance so that the

Defendant could work and pay restitution).  So the Court is clear, the reference to

restitution here is in regards to the judgment soon to be imposed.

While a sentence that foregoes incarceration may on the surface create some

disparity, the concern is for "unwarranted" disparities. There are surely few

defendants that have committed Mr. Brockhoff's offense that have the sort of history and

characteristics that are present here. Accordingly, whatever disparity might be created is

one that is warranted.

The harder issues may be whether a sentence without incarceration serves the

more general concern of deterrence and fulfills the "need for the sentence imposed to

reflect the seriousness of the offense, to promote respect for the law, and to provide just

punishment for the offense." To consider an individual's life, and dedication to his

family, and his long productive, law-abiding life cannot be said to undermine the need for

deterrence, nor does it fail to reflect the seriousness of the offense. Similarly, to base a

sentence on the practical considerations of Mr. Brockhoff's age and his law-abiding

young life neither undermines the need for deterrence nor fails to reflect the seriousness

of the offense. Indeed, sentencing someone such as Mr. Brockhoff to a continued prison sentence may even undermine respect for the law. Thus, the circumstances presented in Mr. Brockhoff's case justify a departure from the Sentencing Guidelines. More importantly, now that the decision in <u>United States v. Booker</u>, 543 U.S. 220 (2005) has made the Guidelines advisory and the parsimony clause of 18 U.S.C. § 3553(a) the paramount consideration, the history and characteristics of Mr. Brockhoff show that a period of supervision that includes home detention is "sufficient but not greater necessary to comply with" the goals of sentencing. Mr. Brockhoff seeks time served followed by the term of supervised release, and therefore, requests this Court to impose just such a sentence.

<u>**Conclusion**</u>

For the foregoing reasons, NICHOLAS BROCKHOFF, respectfully submits that a sentence of probation is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. 3553(a).

Respectfully submitted,

*/S/ ALEX R. STAVROU, ESQ.*

_____

ALEX R. STAVROU, ESQUIRE
13046 Racetrack Road, #333
Tampa, Florida 33626
Phone:     813-251-1289x1
Fax :       813-489-2528
Fl Bar No.:  0108390
Alex@alexstavrou.com

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing Sentencing

Memorandum was filed with the Clerk of the Court and was sent via E-Mail to the

Assistant United States Attorney, Jackeline Schesnol, Esquire, on this 2nd day of May,

2023.

*/S/ ALEX R. STAVROU, ESQ.*

_____
ALEX R. STAVROU, ESQUIRE
13046 Racetrack Road, #333
Tampa, Florida 33626
Phone:     813-251-1289X1
Fax :        813-489-2528
Fl Bar No.:  0108390
Alex@alexstavrou.com